FEDERAL ELECTION COMMISSION,
Plaintiff,

v.

COLORADO REPUBLICAN FED-
ERAL CAMPAIGN COMMIT-
TEE, Defendant.

No. CIV. A. 89 N 1159.

United States District Court,
D. Colorado.

Feb. 18, 1999.

Lawrence M. Noble, Richard B. Bader, Stephen E. Hershkowitz, Colleen T. Sealander, Federal Election Commission, Washington, D.C., for Plaintiff.

Thomas Kirby, Carol A. Laham, Jan Witold Baran, Wiley, Rein & Fielding, Washington, D.C., for Defendant.

## MEMORANDUM OPINION AND ORDER

NOTTINGHAM, District Judge.

This case has come back to the court on remand from the United States Supreme Court and the United States Court of Appeals for the Tenth Circuit. The only claim to have survived the gauntlet is a counterclaim asserted by Defendant Colorado Republican Federal Campaign Committee [hereinafter "Colorado Party"]. This counterclaim asserts a constitutional challenge to a provision of the Federal Election Campaign Act of 1971 [hereinafter "FECA"], *codified, as amended, at* 2 U.S.C.A. §§ 431–456 (West 1997 & Supp. 1998). The provision at issue, which the Supreme Court labeled for convenient reference as "the Party Expenditure Provision," [1] places limits on the amount of money which committees of political parties may expend "in connection with the general election campaign of candidates for Federal office." *See* 2 U.S.C.A. § 441a(d). The matter is now before the court on cross-motions for summary judgment. Jurisdiction is based on 28 U.S.C.A. § 1345 (West 1993).

### FACTS

#### a. Procedural History

Plaintiff Federal Election Commission [hereinafter "FEC"] originally brought this action against the Colorado Party, asking the court to declare: (1) that the disbursement of money which the Colorado Party had made for certain political advertising should have been reported as an "expenditure," as FECA defines that term; and (2) that, had the disbursement been so reported, it would have violated the spending limitations set forth in the Party Expenditure Provision. In 1986, before the Colorado Republican Party had selected its candidate for the senatorial election to take place in the fall of 1986, the Colorado Party bought and aired campaign advertisements attacking Timothy Wirth, the putative candidate of the Democratic Party. The state Democratic Party complained to the FEC. The FEC agreed with the Democratic Party and brought this case.

Relying on previous Supreme Court language and interpretations by the FEC which, to the eye, suggested that political

---

1. *Colorado Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 611, 116 S.Ct. 2309, 2313, 135 L.Ed.2d 795 (1996).

parties were by their nature incapable of making "independent" expenditures on behalf of candidates, this court found, as a matter of law, that the Colorado Party had made a "coordinated" [2] expenditure. *FEC v. Colorado Republican Fed. Campaign Comm.*, 839 F.Supp. 1448, 1452–53 (D.Colo.1993) (relying on *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 28 n. 1, 102 S.Ct. 38, 40 n. 1, 70 L.Ed.2d 23 [1981] [hereinafter *"DSCC"*]; FEC Advisory Opinion 1985–14, 1 Fed. Election Campaign Fin. Guide [CCH] ¶ 5819 [July 18, 1985]; FEC Advisory Opinion 1984–15, 1 Fed. Election Campaign Fin. Guide [CCH] ¶ 5766 [Aug. 16, 1984]). The court then recognized that even a coordinated expenditure is only subject to the limitations of section 441a(d)(3) if it is made "in connection with" a general election campaign. In accordance with Supreme Court and federal circuits' previous interpretations, the court construed the phrase "in connection with" narrowly, as requiring "express advocacy." Thus, the court concluded that the advertisement aired by the Colorado Party did not constitute express advocacy, was not made "in connection with" a general election campaign, and did not run afoul of section 441a(d)(3). *FEC v. Colorado Republican Fed. Campaign Comm.*, 839 F.Supp. at 1455–57.

The Tenth Circuit reversed. *FEC v. Colorado Republican Fed. Campaign Comm.*, 59 F.3d 1015 (10th Cir.1995). The court adopted a definition of the phrase "in connection with" broader than the one used by this court. The Tenth Circuit's definition focused on whether the advertisement contained an "electioneering message" and targeted a clearly identifiable candidate. *Id.* at 1023. The Colorado Party's advertisement, according to the Tenth Circuit, contained such a message and identified Timothy Wirth as its focus. *Id.*

2. The distinction between "independent" and "coordinated" expenditures is discussed be-

The Supreme Court vacated the Tenth Circuit's opinion and remanded the case. The Court rejected the assumption made by both courts below—that political parties were, by definition, only able to make coordinated expenditures—and found, as matter of fact, that the expenditure in this case was an independent one. The Court then considered FECA's limitations on independent expenditures by political parties and deemed the limits unconstitutional. *Colorado Republican Fed. Campaign Comm. v. FEC*, 518 U.S. at 617–20, 116 S.Ct. 2309, 2317–18, 135 L.Ed.2d 795 (1996) [hereinafter *"Colorado I"*]. The Court did not resolve the Colorado Party's counterclaim—a facial challenge to the FECA limits on *coordinated* as well as *independent* expenditures. *Id.* at 623–24, 116 S.Ct. at 2319–20.

### b. *Legal and Factual Background*

The provision at issue is section 441a(d), in particular as it applies to congressional elections. The statute provides as follows:

(1) Notwithstanding any other provision of law with respect to limitations on expenditures or limitations on contributions, the national committee of a political party and a State committee of a political party, including any subordinate committee of a State committee, may make expenditures in connection with the general election campaign of candidates for Federal office, subject to the limitations contained in paragraphs (2) and (3) of this subsection.

．　　　．　　　．　　　．　　　．

(3) The national committee of a political party, or a State committee of a political party, including any subordinate committee of a State committee, may not make any expenditure in connection with the general election campaign of a candidate for Federal office in a State who is affiliated with such party which exceeds—

ginning *infra* at 5.

(A) in the case of a candidate for election to the office of Senator, or of Representative from a State which is entitled to only one Representative, the greater of—

(I) 2 cents multiplied by the voting age population of the State (as certified under subsection (e) of this section); or

(ii) $20,000; and

(B) in the case of a candidate for election to the office of Representative, Delegate, or Resident Commissioner in any other State, $10,000.

2 U.S.C.A. § 441a(d).[3] As I noted earlier, this provision establishes limitations on expenditures made "in connection with the general election campaign of candidates for Federal office."

Expenditures are divided into two categories: independent and coordinated. Coordinated expenditures are those which are made "in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents." 2 U.S.C.A. § 441a(a)(7)(B)(I) (West 1997). Party committees work closely with candidates and campaigns in making coordinated expenditures.[4] (*See* FEC Facts ¶ 38; *admitted at* Colorado Party's Resp. to FEC Facts ¶ 38.)

All other expenditures are independent. In order to make an independent expenditure, a party must be sufficiently distant

from a candidate's campaign and a candidate's campaign strategies that it is able to skirt FECA's definition of a "coordinated" expenditure. *See Colorado I*, 518 U.S. at 614–15, 116 S.Ct. at 2315. Following *Colorado I*, political parties may engage in unlimited independent expenditures on behalf of congressional candidates. *Id.* at 615, 116 S.Ct. at 2315.

The *Colorado I* Court declined, for "prudential" reasons, to consider whether coordinated party expenditures could constitutionally be limited by application of the Party Expenditure Provision. The Court therefore remanded the case for further factual and legal development. *Id.* at 623–25, 116 S.Ct. at 2319–20. The litigants have seized this opportunity to lard the summary judgment record with voluminous documentation and disputation concerning the admissibility and significance of that documentation. The FEC has been especially prone to supply material without any attention to elementary evidentiary requirements, such as authentication (Fed.R.Evid.901), or evidentiary limitations, such as the rule against hearsay (Fed.R.Evid.801). The FEC makes numerous factual assertions, for example, based on reports in newspaper articles. Except as otherwise noted, the discussion which follows simply ignores the mass of irrelevant and/or inadmissible evidence in the record and recites facts which the

3. Section 441a(d) specifies that it applies to the national committee of a political party, state committees of a political party, and subcommittees of state parties. Throughout this Memorandum Opinion and Order, the court refers generically and interchangeably to political parties, parties, and party committees because the Colorado Party and the FEC have not suggested any relevant distinction between these entities, and none is apparent to the court.

4. In 1996, the parties made coordinated expenditures as follows: $19,254,219 by the Republican Party committees (national, state, and local) and $15,843,754 by the Democratic Party committees (national, state, and local). (Federal Election Commission's Statement of Material Facts Not in Genuine Dispute, Sub-

mitted Under Seal ¶ 8 [filed Jan. 23, 1998] [hereinafter "FEC Facts"]; *admitted in pertinent part at* Def. Colorado Republican Federal Campaign Committee's Resp. to the FEC's Statement of Material Facts Not in Genuine Dispute, Submitted Under Seal ¶ 8 [filed Feb. 17, 1998] [hereinafter "Colorado Party's Resp. to FEC Facts"].) The three national Republican Party committees are the Republican National Committee ("RNC"), the National Republican Senatorial Committee ("NRSC"), and the National Republican Congressional Committee ("NRCC"). The three national Democratic Party Committees are the Democratic National Committee ("DNC"), the Democratic Senatorial Campaign Committee ("DSCC"), and the Democratic Congressional Campaign Committee ("DCCC").

court regards as having some significance to the questions before the court.

The money which flows to political parties is a crucial aspect of the dispute before the court. The term "hard" money or "federal" money means that money which may be raised in accordance with FECA limits, and is the only money which parties may spend on behalf of candidates for federal election. Parties may accept hard money only in limited amounts and from limited sources. The aggregate amounts which individuals may give to federal candidates, and federal and state parties, may not exceed $25,000 per year to permissible recipients. 2 U.S.C.A. § 441a(a)(3). "Multicandidate political committees," most commonly referred to as political action committees or PACs, may give up to $15,000 per year to a national party and $5,000 per year to a state party, and such entities are not subject to an aggregate limit. 2 U.S.C.A. § 441a(a)(2). Except through their PACs, corporations and unions may not contribute money to be used in connection with federal elections. 2 U.S.C.A. § 441b(a).

In contrast to the limitations on the money which may be used in connection with federal elections, "soft" money is a term commonly applied to contributions to political parties which FECA does not regulate as to source or amount. "Soft" money may not be spent in connection with federal elections. It may, however, be used for non-federal-election activity, such as "get out the vote" campaigns, issue advocacy, and elections for state office.

In the labyrinth of federal election regulation, both types of money, hard and soft, may flow in all directions. Soft money and hard money may be exchanged. Various state parties have traded soft dollars for hard dollars, and state parties have made similar trades with national party committees.[5] In addition, national party committees transfer hard monies to state and local party committees in accordance with 11 C.F.R. § 110.3(c)(1) (1997).[6] (See FEC Facts ¶ 19; admitted at Colorado Party's Resp. to FEC Facts ¶ 19.) National parties may also transfer their own soft money to state parties. The national parties (the RNC, for example) report such activities to the FEC; the Colorado Party reports its non-federal money activity to the Colorado Secretary of State. (See FEC Facts ¶ 20; admitted in pertinent part at Colorado Party's Resp. to FEC Facts ¶ 20.)

In addition to the transfer of money, party committees are permitted to—and do—share or transfer agency authority to other party entities. The transfer of such authority appears to have the same practical effect as the exchange of hard dollars

5. The FEC asserts that the exchanges were typically not dollar-for-dollar exchanges but, rather, reflected a premium for the higher value of hard dollars. (FEC Facts ¶¶ 43–48.) The Colorado Party admits only one exchange: the Texas Republican Party, needing federal (i.e., hard) funds late in the 1996 campaign swapped $35,000 in federal funds for non-federal funds (i.e., soft) with the Colorado Republican Party. (FEC Facts ¶ 43; admitted at Colorado Party's Resp. to FEC Facts ¶ 43.)

With respect to all of the FEC's other money exchange allegations—including those regarding premiums paid for hard money—the Colorado Party admits that such exchanges have been reported but disputes the truth of the matter reported and objects to the consideration of such evidence as "unreliable hearsay." (Colorado Party's Resp. to FEC Facts ¶¶ 44–48.) The FEC claims to be offering the assertions only for the fact that they were reported and not for the truth of the reported material. I do not understand how the mere reporting that a premium was paid for hard dollars is relevant in this case, and I therefore treat such assertions as inadmissible hearsay.

6. For example, in the 1996 senate elections, the RNC transferred $166,068 to the Colorado Party. The Colorado Party used that money as an expenditure coordinated with the campaign of Wayne Allard. The parties dispute whether the Colorado Party would have made this expenditure without such a transfer. (FEC Facts ¶ 31; Colorado Party's Resp. to FEC Facts ¶ 31.) The coordinated expenditure limit for Colorado senate candidates in the 1996 election was almost $171,000. (FEC Facts ¶¶ 29–30; admitted in pertinent part at Colorado Party's Resp. to FEC Facts ¶¶ 29–30.)

for soft dollars. The transferee committee is then responsible for making expenditures under section 441a(d). (FEC Facts ¶¶ 21–22, 24–27, 34–37; *admitted in pertinent part at* Colorado Party's Resp. to FEC Facts ¶¶ 21–22, 24–27, 34–37.)

The various party committees keep track of all this by maintaining separate accounts according to the use for which money may be expended. For example, the NRSC has a federal (i.e., hard money) account which it uses to support federal candidates and two non-federal (i.e., soft money) accounts which it uses for party-building activities. In particular, the NRSC focused in 1995 and 1996 on states with active senate races where party-building money would be of assistance. (FEC Facts ¶ 18; *admitted in pertinent part at* Colorado Party's Resp. to FEC Facts ¶ 18.)

Because political parties do not have money of their own, they must raise funds from contributors. Money to be used for party expenditures on behalf of candidates is "generated through ongoing fund-raising operations that include direct-mail solicitations, telemarketing efforts, party fund raisers, an annual congressional dinner, and the solicitation of individual donors." (Statement of Undisputed Facts and Supporting Exs. ¶ 23, Ex. B [Corrado Report at 20] [filed Jan. 23, 1998] [hereinafter "Colorado Party Facts"]; *admitted at* Federal Election Commission's Resp. to the Colorado Party's Statement of Undisputed Facts and Supporting Exs. ¶ 23 [filed Feb. 17, 1998] [hereinafter "FEC's Resp. to Colorado Party Facts"].) According to the Colorado Party, the "vast majority of the monies used for coordinated expenditures are generated through contributions of relatively small amounts from individual donors." (Colorado Party Facts ¶ 23, Ex. B [Corrado Report at 20].) The FEC refuses to admit that the "vast" majority of such funds are raised in the manner described. The evidence in the record, however—particularly the testimony of Haley Barbour, RNC Chairman from 1993 to 1997, former Congressman Tony Coehlo, DCCC Chairman from 1981 to 1986,

and Jon Heubusch, Executive Director of the NRSC during the 1995–1996 election cycle—demonstrates that at least the majority of hard money received by the parties is in the form of small (i.e., less than $100) contributions from individual contributors. (*See* Joint Ex. Vols. II, ·Ex. G [Barbour Dep. at 23 ("[I]n the first couple of years I was Chairman I believe more than 70 percent of all our revenue came in contributions of $100 or less.")], Ex. J [Coehlo Dep. at 24, 36 (recognizing the value of direct mail which became the "major revenue source" based on contributions averaging $35)], Ex. M [Heubusch Dep. at 99] [filed Jan. 23, 1998].) These hard-money contributions overwhelmingly result from direct-mail solicitations at the national level, and from direct-mail and telephone solicitations at the state party level. (Colorado Party Facts ¶ 24; *admitted at* FEC's Resp. to Colorado Party Facts ¶ 24.)

The FEC offers almost forty factual allegations regarding candidate fund raising for parties. (FEC Facts ¶¶ 95–132.) Some of them are undisputed. With specific reference to the Colorado Party, the parties agree that Republican federal candidates and officeholders are asked to assist in fund raising. This assistance includes their attendance at fund-raising events as a "draw" to other potential attendees, permission to identify the candidates and/or officeholders as co-hosts of fund raisers at which hard and soft money are raised, and signing a direct-mail fund-raising letter. (FEC Facts ¶ 122; *admitted at* Colorado Party's Resp. to FEC Facts ¶ 122.)

In general, the evidence offered by the FEC indicates that candidates and officeholders raise funds for their parties in disparate ways. Members of Congress are encouraged by their party to transfer excess campaign funds to the party or a committee thereof and to help raise money for the party. (FEC Facts ¶¶ 96–100.) Further, the FEC highlights what is known as a "tally" system, whereby party

committees keep track of the Member of Congress who is responsible for contributions to the campaign committees. Some candidates willingly raise money for the party and party committees; others are less committed to the parties' common pursuits, at least with respect to finances. (*See, e.g.,* FEC Facts ¶¶ 96, 97.) Some raise money for the party even when they are not themselves in an election, or when they otherwise have no expectation of receiving funds from the party in return for their efforts. (*See* FEC Facts ¶¶ 104, 120.) Other Members of Congress raise money for their party and, in turn, request that they receive assistance in the form of coordinated expenditures. (*See* FEC Facts ¶¶ 125, 126, 130, 131.) Many, although not all, Members of Congress raise money on behalf of the party from contributors who have already given the maximum permissible amount to the individual candidate's campaign. (FEC Facts ¶¶ 133–43.) Where fund raising is done in conjunction with a candidate, and the potential contributor has already contributed the maximum amount directly to the candidate, the contributor is made aware that, although any contribution to the party would not go directly to the candidate, it would indirectly assist the candidate by assisting his or her party. (FEC Facts ¶¶ 103, 115, 132.) Parties also cultivate giving from PACs and encourage giving from PACs based on the performance of competing PACs. (*See* FEC Facts ¶¶ 83–86, 88–91, 93.)

The evidence offered by the FEC suggests that the parties take into consideration the fund-raising efforts of candidates in deciding allocations of campaign funds. (*See* FEC Facts ¶¶ 99, 101–03, 116, 118.) The evidence also indicates, however, that the primary consideration in allocating funds is which races are marginal—that is, which races are ones where party money could be the difference between winning and losing, (*see* FEC Facts ¶¶ 106, 109), assuming that a candidate is competent, exercises common sense, and acts professionally, (FEC Facts ¶ 7; *admitted at* Colorado Party's Resp. to FEC Facts ¶ 7; *see also* FEC Facts ¶ 9). Maintaining party control over seats is paramount to the parties' pursuits. (*See, e.g.,* FEC Facts ¶¶ 222–223, 225.) Candidates in need of funding do request assistance and attempt to lobby those with control over allocations. (FEC Facts ¶ 106; *admitted in pertinent part at* Colorado Party's Resp. to FEC Facts ¶ 106.)

The FEC makes numerous factual claims regarding where contributors to the political parties choose to make their donations and what they allegedly gain in return. In particular, the FEC highlights the various party-donor programs and the benefits and access to Members of Congress which a contributor gains by giving at various levels. (FEC Facts ¶¶ 50–65, 68–78, 161–210.) The FEC also suggests that, in exchange for financial support, contributors to party committees expect that party committees will intercede with candidates and officeholders on behalf of large contributors.[7] (FEC Facts ¶¶ 242–81.) The evidence offered also addresses

---

7. Of those allegations, fewer than ten even mention the name of a specific Member of Congress or Members of Congress in general. (FEC Facts ¶¶ 242–45, 247–48, 269.) The remainder involve party committee interactions with the White House or other parts of the executive branch. Further, many involve soft-money contributions. As with many other allegations by the FEC, these allegations are simply not relevant to the dispute before the court. Suggesting or arranging for meetings between party contributors and the President or Vice President or any other administration officials has no bearing on the constitutionality of limits on coordinated party expenditures. Even the FEC's allegations which do involve Members of Congress fail to even suggest that coordinated party expenditures result in quid pro quo corruption or the appearance thereof. Further, the fact that Senator Wirth, for example, was asked to meet with large donors to the party with whom he had not previously met, (*see* FEC Fact ¶ 243), offers no support for the FEC's position. If anything, the evidence suggests that party committees who attempted to arrange meetings for donors with legislators were kept from doing so by staff, where such a meeting would be "inappropriate." (FEC Facts ¶ 242.)

the fund-raising practices by which Members of Congress solicit money and existing donors are recruited to bring others into the donating fold. In some cases, contributors give money directly to a party committee instead of giving to a candidate if, for example, the contributor is a PAC and the candidate does not accept PAC contributions. (FEC Facts ¶ 144.) There is evidence that one reason contributors give to party committees after having given directly to a candidate is to help their candidate indirectly. (FEC Facts ¶¶ 135–37, 139.)

The FEC contends that party committees exert influence over candidates.[8] (FEC Facts ¶¶ 211–41.) The FEC's evidence includes newspaper articles alleging that party leaders have suggested withholding campaign funds from candidates if they refuse to adopt a particular policy position. (See FEC Facts ¶¶ 234, 238–39; Federal Election Commission's Supplemental Statement of Material Facts Not in Genuine Dispute ¶ 307 [filed Feb. 17, 1998] [hereinafter "FEC Supplemental Facts"].) As with the other instances where the FEC attempts to rely on newspaper reports in support of its factual assertions, however, the court will not accept such evidence as establishing the facts reported therein.

Resting on hundreds of factual allegations and thousands of pages of documentation, the Colorado Party and the FEC filed cross motions for summary judgment. (Mot. for Summ. J. [filed Jan. 23, 1998]; Def./Counter–Pl.'s Mot. for Summ. J. [filed Jan. 23, 1998].) The FEC contends that the Colorado Party has failed to present a justiciable controversy and seeks summary judgment on the grounds of standing and ripeness. (Federal Election Commission's

Mem. in Supp. of Its Mot. for Summ. J., Submitted Under Seal at 17–20 [filed Jan. 23, 1998] [hereinafter "FEC's Summ. J. Br."].) At the heart of its argument on the merits, the FEC maintains that the Party Expenditure Provision serves a compelling Government interest and is narrowly tailored to achieve that interest. (Id. at 21–36.) It also maintains that the Party Expenditure Provision is not unconstitutionally vague. (Id. at 36–38.) The Colorado Party maintains that the Party Expenditure Provision severely restricts core First Amendment rights and that the FEC cannot carry its burden of establishing that the limits contained in the provision serve compelling governmental interests. (Mem. in Supp. of the Colorado Party's Mot. for Summ. J. [filed Jan. 23, 1998] [hereinafter "Colorado Party's Summ. J. Br."].)

## ANALYSIS

### 1. Justiciability

#### a. Standing

In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the Supreme Court held that "the irreducible constitutional minimum of standing" contains the following three elements:

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized; and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant[s], and not ... the result [of] the independent

---

8. The FEC also makes allegations regarding activities by "party leaders" in assisting in state elections. (FEC Facts ¶¶ 283–91.) Those allegations do not, however, involve any Members of Congress. The allegation regarding the use of non-federal money by Republican Party leaders to assist in state elections involves soft money and does not suggest corruption or the appearance thereof.

(FEC Facts ¶ 282.) What it does suggest is that parties are not just concerned at electoral success at the federal level, and that furthering parties' agendas at the state level is also an important aspect of parties' goals. The connection between these alleged activities and the corruption which the FEC claims will follow from unlimited party coordinated expenditures is not apparent to the court.

action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan,* 504 U.S. at 560–61, 112 S.Ct. at 2136 (citations omitted); *accord Committee to Save the Rio Hondo v. Lucero,* 102 F.3d 445, 447 (10th Cir.1996). Plaintiff bears the burden of proving standing. *Lujan,* 504 U.S. at 561, 112 S.Ct. at 2136; *Gilbert v. Shalala,* 45 F.3d 1391, 1394 (10th Cir.1995). Where a challenge to standing is before the court on a motion for summary judgment, "standing must be supported by specific evidentiary facts and not by mere allegations." *Phelps v. Hamilton,* 122 F.3d 1309, 1326 (10th Cir.1997) (citing *Lujan,* 504 U.S. at 562, 112 S.Ct. at 2137). Here, the FEC questions whether the Colorado Party meets the injury-in-fact element of standing under *Lujan.*

 It is a constitutional certainty that elections will continue to occur. U.S. Const. Art. I, § 2, cl. 1; U.S. Const. amend XVII. It is almost as certain that the Colorado Party will have candidates in those elections whom it will want to support by way of coordinated expenditures. Indeed, during the 1996 federal election year, the Colorado Party made a single, large coordinated expenditure on behalf of its successful senatorial candidate, Wayne Allard. This expenditure alone came to within $4,000 of the limit which section 441a(d) imposed on the Colorado Party's coordinated expenditures for the senate race. (FEC Facts ¶ 30; *admitted in part and denied in part at* Colorado Party's Resp. to FEC Facts ¶ 30.) Donald K. Bain, erstwhile chairman of the Colorado Party, testified that the Colorado Party "was, is, and for the foreseeable future will be ready, willing, and able to spend more [on coordinated expenditures than FECA permits]." (Colorado Party Exs. Vol. III, Ex. P [Bain Aff. ¶ 3] [filed Jan. 23, 1998] [hereinafter "Colo. Exs. Vol. III"].) Bain further testified that, in the 1996 campaign, the Colorado Party considered a coordinated expenditure in excess of the FECA limits, but ultimately refrained from making the expenditure because of the concern that the FEC would challenge such an expenditure. (*Id.,* Ex. P [Bain Aff. ¶ 4].) The Colorado Party's supposition that the FEC would challenge any coordinated expenditure exceeding the FECA statutory limit is not fanciful, for this case began as an FEC enforcement proceeding under the very section which is at issue now.

In these circumstances, I conclude that the Colorado Party has made a sufficient showing of injury-in-fact. It possesses the intent and the ability to make coordinated expenditures which exceed statutory limitations, and it would confront FEC enforcement action if it did so. Contrary to the FEC's apparent argument, the fact that the Colorado Party receives some money from the RNC or other national party committees for coordinated expenditures does not logically require the conclusion that the Colorado Party is impermissibly attempting to assert standing on behalf of the RNC. (*See* FEC's Summ. J. Br. at 19.) The source of funds which a political party expends for a candidate is simply irrelevant to the question of whether the coordinated expenditure limitation constrains and chills the speech of the party on behalf of its candidates. Similarly, the fact that the Colorado Party may, from time to time, lack hard money which would permit it to exceed the expenditure limitations does not defeat its standing. It may still receive hard funds from national or state party committees, and receipt of such funds would permit it to make expenditures which would exceed the limitations. Accordingly, I conclude that the Colorado Party has standing to challenge the coordinated expenditure limits.

### b. Ripeness

 Ripeness has been described as "providing a time-bound perspective[ ] on the injury inquiry of standing." *DKT Mem'l Fund v. Agency for Int'l Dev.,* 887 F.2d 275, 298 (D.C.Cir.1989) (quoting 13 Charles A. Wright, Arthur R. Miller &

Edward H. Cooper, *Federal Practice and Procedure* § 3531, at 350 [2d ed.1990] ). The inquiry involves two elements: (1) the fitness of the issues for judicial decision; and (2) the hardship from withholding court consideration. *Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Ripeness includes both constitutional elements and prudential elements. Because, however, this case involves First Amendment rights, the prudential elements on standing are lessened. *Phelps,* 122 F.3d at 1326 (citing *Secretary of State of Md. v. Joseph H. Munson Co.,* 467 U.S. 947, 956, 104 S.Ct. 2839, 2847, 81 L.Ed.2d 786 [1984]; *ACORN v. City of Tulsa, Okla.,* 835 F.2d 735, 738 [10th Cir.1987] ).

■ The FEC contends that the Colorado Party has failed to demonstrate the existence of a live dispute regarding the actual or threatened application of section 441a(d). (FEC's Summ. J. Br. at 20.) The FEC's position, in light of the history of this case and the Colorado Party's allegations and evidence regarding its campaign practices, limitations, and intentions, is unpersuasive. As noted, this case began as an enforcement action under section 441a(d) for the Colorado Party's exceeding the coordinated expenditure limits imposed thereunder. The Supreme Court ultimately determined that the expenditure at issue was independent and not coordinated, but the reality facing the Colorado Party is that (1) what was believed to be a coordinated expenditure in excess of the limits was challenged in the past, and (2) the Colorado Party can expect to face and FEC challenge in the next election cycle if it makes a coordinated expenditure in contravention of section 441a(d). The Colorado Party need not wait for that to occur before a court considers its challenge to the coordinated expenditure limit. *See Secretary of State of Md.,* 467 U.S. at 956–57, 104 S.Ct. at 2847.

Indeed, the Court in *Colorado I* noted only that the case may be moot if in fact the Colorado Party wanted to make only independent expenditures. *Colorado I,* 518 U.S. at 624, 116 S.Ct. at 2320. The Colorado Party has clearly indicated that it is not content with unlimited independent expenditures, has curtailed coordinated expenditures in the past to avoid the specter of an FEC enforcement action, and wants to make coordinated expenditures which exceed what it contends is an impermissible limit on such expenditures. Accordingly, I conclude that the issue is fit for judicial consideration. Further, the Colorado Party would incur substantial hardship if this court were to refuse to hear its challenge until it actually violated the statute and found itself on the other side of an FEC action like the one that began this present judicial odyssey. *Cf. Buckley,* 424 U.S. at 117–18, 96 S.Ct. at 681–82 (permitting challenge to method of appointing FEC members in anticipation of future rulings and determinations by the FEC). Accordingly, I conclude that the case is ripe for determination.

*2. Severability*

■ The Supreme Court directed that, on remand, the lower courts consider whether Congress would have wanted the Party Expenditure Provision to stand were the limits contained therein to apply only to coordinated, and not to independent, expenditures. *Colorado I,* 518 U.S. at 625–26, 116 S.Ct. at 2320–21. A conclusion that the limits on coordinated party expenditures cannot be severed from the unconstitutional limits on independent party expenditures would permit the court to resolve the Colorado Party's challenge to section .441a(d) as a matter of statutory construction, without reaching the constitutional issue of whether the First Amendment permits legislative limits on coordinated expenditures. *See United States v. Locke,* 471 U.S. 84, 92 & n. 9, 105 S.Ct. 1785, 1791 & n. 9, 85 L.Ed.2d 64 (1985). The Colorado Party contends that, the congressional attempt to limit a political party's independent expenditures having been found unconstitutional, Congress would never have intended to regulate only a political party's coordinated expen-

ditures. The Colorado Party would thus have the court conclude that the limitation on coordinated expenditures must fall under the weight of the Court's decision in *Colorado I* concerning independent expenditures.

FECA contains a strong severability provision: "If any provision of this Act, or the application thereof to any person or circumstance, is held invalid, the validity of the remainder of the Act and the application of such provision to other persons and circumstances shall not be affected thereby." 2 U.S.C.A. § 454. Such a clause "evidences a congressional intent to minimize the burdens imposed by a declaration of unconstitutionality." *Califano v. Westcott*, 443 U.S. 76, 90, 99 S.Ct. 2655, 2664, 61 L.Ed.2d 382 (1979) (construing an identically worded severability clause in the Social Security Act). The inclusion of such a clause "creates a presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686, 107 S.Ct. 1476, 1481, 94 L.Ed.2d 661 (1987) (citations omitted). "Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Buckley v. Valeo*, 424 U.S. 1, 108–09, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976) (internal citation and quotation marks omitted). " '[A] court should refrain from invalidating more of the statute than is necessary.' " *Alaska Airlines, Inc.*, 480 U.S. at 684, 107 S.Ct. at 1479 (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652, 104 S.Ct. 3262, 3268, 82 L.Ed.2d 487 [1984] [plurality opinion] [internal citation and quotations marks omitted] ).

There is no evidence that Congress would have rejected the Party Expenditure Provision as it applies to coordinated expenditures in the absence of a limit on independent expenditures. Nothing necessarily and inherently links limits on independent expenditures with limits on coordinated expenditures. Section 441a(d) can

operate to limit the latter without any regulation of the former. Because there is no evidence to the contrary, the presumption created by FECA's strong severability clause compels the conclusion that the Party Expenditure Provision, as it applies to coordinated expenditures, remains in effect. The Colorado Party's motion is denied insofar as the Colorado Party seeks summary judgment on the ground that the unconstitutional independent expenditure limitation cannot be severed from the remainder of the Party Expenditure Provision.

### 3. The Merits of the Case: Constitutional Challenge to Section 441a(d)

#### a. Legislative History

The Colorado Party contends that, because the Party Expenditure Provision was enacted for the constitutionally infirm purpose of curtailing what Congress saw as excessive and wasteful campaign spending, it should be held unconstitutional. (Colorado Party's Summ. J. Br. at 19–21.) The Party Expenditure Provision, currently codified as 2 U.S.C.A. § 441a(d), had its origins in the Congress' 1974 federal election legislation. *See* Federal Election Campaign Act Amendments of 1974, Pub.L. No. 92–225, 86 Stat. 3 (then codified as 18 U.S.C.A. § 608[f] ). *Buckley* recognized that the primary effect of the expenditure limitations, such as those embodied in what was then 18 U.S.C.A. § 608(f), was to limit the quantity of political speech. *Buckley*, 424 U.S. at 39, 96 S.Ct. at 644. In the aftermath of *Buckley*, Congress repealed 18 U.S.C.A. § 608. *See* Federal Election Campaign Act Amendments of 1976, Pub.L. No. 94–283, 90 Stat. 496. At the same time, Congress enacted a new section, codified as 2 U.S.C.A. § 441a, which incorporated and augmented the Party Expenditure Provision, as it been enacted in 1974. *See* Federal Election Campaign Act Amendments of 1976, Pub.L. No. 94–283, 90 Stat. 489. The Court has since recognized that "Congress wrote the Party Expenditure Provision not

so much because of a special concern about the potentially 'corrupting' effect of party expenditures, but rather for the constitutionally insufficient purpose of reducing what it saw as wasteful and excessive campaign spending." *Colorado I,* 518 U.S. at 618, 116 S.Ct. at 2317 (citing *Buckley,* 424 U.S. at 57, 96 S.Ct. at 653). Congress, however, reenacted the Party Expenditure Provision in light of the principles established in *Buckley.* Further, *Buckley* (and the Supreme Court precedents established therefrom) indicates that the primary purpose of FECA is to prevent corruption and the appearance thereof. *See Buckley,* 424 U.S. at 25–27, 96 S.Ct. at 637–39. Thus, although the origins of the Party Expenditure Provision included a constitutionally impermissible purpose, FECA also sought to control quid pro quo corruption or the appearance thereof. That FECA combined impermissible motives with permissible ones does not compel the conclusion that the Party Expenditure Provision is unconstitutional. Rather, the court must consider coordinated expenditures in light of the constitutional standards for regulating political speech.

### b. Coordinated Expenditures by Political Parties

■ The FEC suggests at the outset that it need only meet an intermediate standard of scrutiny with respect to limits on coordinated party expenditures. In *Colorado I,* the Supreme Court reviewed previous cases which challenged provisions of FECA on First Amendment grounds. The Court determined that the analysis it had engaged in was "essentially weigh[ing] the First Amendment interest in permitting candidates (and their supporters) to spend money to advance their political views, against a 'compelling' governmental interest in assuring the electoral system's legitimacy, protecting it from the appearance and reality of corruption." *Colorado I,* 518 U.S. at 609, 116 S.Ct. at 2313 (citing *FEC v. Massachusetts Citizens for Life,* 479 U.S. 238, 256–63, 107 S.Ct. 616, 626–30, 93 L.Ed.2d 539 [1986]; *FEC v. National Conservative Political Action Comm.,*

470 U.S. 480, 493–501, 105 S.Ct. 1459, 1466–71, 84 L.Ed.2d 455 [1985] [hereinafter *"NCPAC"*]; *California Med. Ass'n v. FEC,* 453 U.S. 182, 193–99, 101 S.Ct. 2712, 2720–23, 69 L.Ed.2d 567 [1981]; *Buckley,* 424 U.S. at 14–23, 96 S.Ct. at 632–37, 46 L.Ed.2d 659). In accordance with the standard established by the Supreme Court, and contrary to the FEC's suggestion, the FEC must demonstrate that the Party Expenditure Provision serves a compelling Government interest and is narrowly tailored. FEC carries a heavy burden of proof.

Section 441a(a) places dollar limits on contributions by persons and by multicandidate political committees. As noted earlier, coordinated expenditures are considered contributions. *See* 2 U.S.C.A. § 441a(a)(7)(B)(I). The FEC suggests that because coordinated expenditures are considered contributions, and contributions have been permissibly limited by the Supreme Court, this court's inquiry is at an end. (Br. by Counter–Def. Federal Election Commission in Opp'n to Mot. for Summ. J. at 5–9 [filed Feb. 17, 1998].) While it is true that the Court has permitted regulation of contributions, and that coordinated expenditures have been considered, in other circumstances, to be contributions, that does not end this court's inquiry. First, the court is not bound by the Government-selected labels or characterizations, particularly in the context of a First Amendment challenge. *Colorado I,* 518 U.S. at 627, 116 S.Ct. at 2321 (citing *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 843, 98 S.Ct. 1535, 1544, 56 L.Ed.2d 1 [1978] ["Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake."] ). Second, the Court has permitted regulation of contributions in the past because the regulations imposed only a "marginal restriction" on the contributor's First Amendment rights. *See Colorado I,* 518 U.S. at 627, 116 S.Ct. at 2321 (citing *Buckley,* 424 U.S. at 20, 96 S.Ct. at 635.) Thus, the question before the court is whether limits on coordinated party expen-

ditures minimally restrict parties in engaging in protected First Amendment freedoms and serve a compelling Government interest. The case cannot be resolved solely by convenient reference to established categories.

The only permissible purpose for limitations on campaign expenditures is to prevent corruption or the appearance thereof. "Corruption is a subversion of the political process. Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns. The hallmark of corruption is the financial quid pro quo: dollars for political favors." *NCPAC*, 470 U.S. at 497, 105 S.Ct. at 1468. The FEC's attempt to broaden the definition of corruption to include mere access is unsupported by precedent. In *Buckley*, the Court recognized that campaign finance reporting requirements serve the purpose of (1) identifying "[t]he sources of a candidate's financial support," and (2) deterring actual corruption and avoiding the appearance of corruption because "[a] public armed with information about a candidate's most generous supporters is better able to detect any post-election special favors that may be given in return." *Buckley*, 424 U.S. at 67, 96 S.Ct. at 658; *cf. McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 356 n. 20, 115 S.Ct. 1511, 1523 n. 20, 131 L.Ed.2d 426 (1995) (recognizing that in *United States v. Harriss*, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 [1954], the Court upheld limited disclosure requirements for lobbyists and stating that "[t]he activities of lobbyists who have direct access to elected representatives, if undisclosed, may well present the appearance of corruption."). *Buckley* thus recognized that money, in many cases, may grant access to a candidate. It did not, however, conclude that such access is akin to corruption or the appearance of corruption.

The FEC seeks to broaden the definition of corruption to the point that it intersects with the very framework of representative government. Corruption cannot be defined so broadly. Nor can corruption

be defined to include whatever it is that political parties and candidates do which the FEC does not like. In order to carry its heavy burden, the FEC must establish that limiting party coordinated expenditures is necessary to avoid corruption or the appearance thereof.

"The First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 223, 109 S.Ct. 1013, 1020, 103 L.Ed.2d 271 (1989). Political parties, and the central activities in which they engage, are a paradigm of the right to freedom of association as guaranteed by the First Amendment. *Id.*, 489 U.S. at 224, 109 S.Ct. at 1020–21. FECA specifically defines a political party as "an association, committee, or organization which nominates a candidate for election to any Federal office whose name appears on the election ballot as the candidate of such association, committee, or organization." 2 U.S.C.A. § 431(16). FECA makes special provisions for political parties, 2 U.S.C.A. § 441a(d), and establishes a special position for them in the statutory framework out of the recognition that "a vigorous party system [is] vital to American politics." S. Rep. 93–689 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5587, 5593. A political party is an entity which (1) allows the individual voter to associate with others who share similar political beliefs, (2) identifies people who constitute the party, and (3) "select[s] a 'standard bearer who best represents the party's ideologies and preferences.'" *Eu*, 489 U.S. at 224, 109 S.Ct. at 1020–21 (citing *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214, 107 S.Ct. 544, 548, 93 L.Ed.2d 514 [1986] [internal citations and quotations omitted] and quoting *Ripon Soc., Inc. v. National Republican Party*, 525 F.2d 567, 601 [1975]). Political parties "can give effect to their views only by selecting and supporting candidates." *Colorado I*, 518 U.S. at 629, 116 S.Ct. at 2322 (Kennedy, J. concurring in judgment and dissenting in part). Thus, political parties

must have a continuing sense of their purpose and existence to succeed. *Cf. Anderson v. Celebrezze,* 460 U.S. 780, 821, 103 S.Ct. 1564, 1586–87, 75 L.Ed.2d 547 (1983) (Rehnquist, J., dissenting) ("Political parties have, or at least hope to have, a continuing existence, representing particular philosophies. Each party has an interest in finding the best candidate to advance its philosophy in each election.").

Political parties, like PACs, "act in the political arena, ... seek to elect candidates of their choice, ... spend money, [and] want some policy outcome." (Colorado Party Facts ¶ 44, Ex. A [Alexander Report] at 17.) According to the Colorado Party, however, parties differ in at least one salient way from PACs. "While the various interest groups (and their PACs) usually have one specific goal or concern, political parties represent an amalgam or coalition of interests and goals; moreover, the purpose of parties is to gain control of government, rather than to pursue single goals, as PACs do." (Colorado Party Facts ¶ 44, Ex. A [Alexander Report at 17]; *see also id.* ¶ 33, Ex. A [Alexander Report at 24] [discussing the parties' need to be focused on longterm], Ex. E [Alexander Dep. at 111–12, 115] ["The party can't afford to get in a situation that is corrupt or corrupting because the party has to be held accountable, and the party is held accountable through the ballot."].) Parties help to build broad-based coalitions, both in terms of issues and in terms of geography, and parties are held accountable at the ballot box by the voters. (*See* Colorado Party Facts ¶¶ 45–48.) There is an identity cultivated by the law and borne out in fact between a political party and a candidate who represents that he or she is of that party. Political parties function, in large part, to elect persons who represent the shared political beliefs of their members. Thus, First Amendment rights — the freedom of speech and the freedom of association — are critical to attaining that goal. *See Colorado I,* 518 U.S. at 629, 116 S.Ct. at 2321 (Kennedy, J., concurring in judgment and dissenting in part).

The Colorado Party describes independent expenditures as "unnatural" because such expenditures "create an artificial separation of the party and its candidate." The need to be independent of a candidate and his or her campaign so as not to run afoul of the requirements for independent expenditures and fall within the regulations on coordinated expenditures dampens the ability to engage in the party's normal functions and imposes additional costs and burdens to promote the party message. (Colorado Party Facts ¶¶ 31–32, Ex. A [Alexander Report at 25], Ex. B [Corrado Report at 35–37], Ex. C [Sorauf/Krasno Report at 44, 46], Ex. F [Bain Dep. at 46–47], Ex. K [Corrado Dep. at 54–56].) For example, independent expenditures do not qualify for the lowest rates on the purchase of broadcasting time, as coordinated expenditures would. (Colorado Party Facts ¶ 32, *admitted in pertinent part at* FEC's Resp. to Colorado Party Facts ¶ 32.) Because independent expenditures are perceived as often inefficient and counterproductive, it is suggested that the Colorado Party and other entities will not engage in them or will do so with extreme caution. (Colorado Party Facts ¶¶ 36–37, Ex. F [Bain Dep. at 47], Ex. M [Heubusch Dep. at 102, 106]; *see also id.* ¶ 38, Ex. A [Alexander Report at 24–25].) Coordinated expenditures, on the other hand, provide the candidate and the party the optimum opportunity to communicate their message. (Colorado Party Facts ¶¶ 40–41, 43.) Thus, unlike contributions, communications via coordinated party expenditures implicate core First Amendment rights. The message of the party and the message of the candidate are unified, and the party's dollars cannot be characterized as simply speech by proxy.

■ The FEC's argument is relatively simple: a powerful party hierarchy, made so because of its ability to grant or withhold funding for unlimited coordinated expenditures, has the ability to exact a quid pro quo from a candidate who needs assistance from the party during his or her

campaign. The FEC contends that "the record contains ample evidence ... that large coordinated expenditures create the opportunity for [quid pro quo] arrangements." (FEC Summ. J. Br. at 24.) The FEC's claim fails. To support its argument, the FEC offers hundreds of factual allegations detailing party fund-raising practices, donor expectations of access, and party control over candidates. The facts which FEC contends support its position, however, do not establish that the limit on party coordinated expenditures is necessary to prevent corruption or the appearance thereof. The FEC must do more than show "the opportunity" for corruption. *See Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 664, 114 S.Ct. 2445, 2470, 129 L.Ed.2d 497 (1994) ("When the Government defends a regulation on speech as a means to ... prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured.") (citation and internal quotation marks omitted); *NCPAC,* 470 U.S. at 498, 105 S.Ct. at 1469.

The FEC appears to identify two types of "corruption" which are addressed by the Party Expenditure Provision. First, the FEC suggests that contributors to the party committees—individuals and PACs—are so powerful that they could force the party committee to compel a candidate to take a particular position. Second, parties themselves have agendas which they wish to pursue and will support only those candidates who agree to follow that agenda.

With respect to the former type of "corruption," the Colorado Party contends that the FEC can offer no evidence of any quid pro quo corruption where a Member of Congress took an official action in ex-change for any contribution to a political party. (Colorado Party Facts ¶ 58.) The FEC denies this assertion, offering what it claims are seven examples of such conduct. (FEC Facts ¶¶ 94, 179, 205, 250, 251, 262, 263.) The Colorado Party objects to all of these examples on various grounds. The FEC's factual assertions suffer numerous flaws. The evidentiary objections are all good ones. In addition, even if the proffered evidence were admissible, it does not support the FEC's position that limiting coordinated party expenditures serves the compelling Government interest of preventing corruption or the appearance thereof. The alleged facts either (1) involve claims of access, which, as the court has stated above, does not constitute corruption, or (2) involve soft money, which may not be used for coordinated expenditures anyway. None of the FEC's examples involve coordinated expenditures. The FEC cannot maintain the constitutionality of the coordinated expenditure provision by pointing to examples of money in the political process which are unrelated to party coordinated expenditures.[9]

Moreover, because of the limits on hard-money contributions, which are the only funds permissibly used for coordinated party expenditures, I regard contributor-to-party-to-candidate pressure as an unlikely avenue of corruption, based on the facts in the record.[10] The FEC attempts to cloud the evidentiary picture before the court by including evidence of soft-money contributions. While soft money may be received in unlimited amounts and from a multitude of sources, there is no suggestion in the evidence that such money is also used for coordinated expenditures. To the extent that the FEC suggests that

9. Moreover, if the skirting of contribution limits is the issue with which the FEC is concerned (*see* FEC Summ. J. Br. at 28–32), there are more tailored means of addressing such a concern than limiting the coordinated expenditure limits. *See Colorado I,* 518 U.S. at 616–17, 116 S.Ct. at 2316.

10. If Congress is concerned about how much hard money parties may receive, it may cur-tail such limits and do so directly and constitutionally. *Cf. Colorado I,* 518 U.S. at 617, 116 S.Ct. at 2316 (recognizing, in considering limits on independent party expenditures, that Congress could directly regulate contribution limits rather than indirectly prevent their circumvention by limiting independent expenditures).

the court should consider the cumulative impact of hard and soft money contributions from one entity, I reject the suggestion. This case is not about the entirety of the campaign finance system.

Further, that candidates are made aware of who contributes to their campaigns and to the parties, despite the FEC's attempt to cast a sinister pall over such activity, is not, by itself, evidence of corruption or the appearance of corruption. The FECA reporting requirements which indicate the sources and amounts of contributions are designed to insure that campaign finance can be scrutinized. *Buckley,* 424 U.S. at 60–83, 96 S.Ct. at 654–66. Nothing in the record suggests that this type of fund raising and reporting begets corruption or the appearance of corruption.

With respect to the other type of "corruption" identified by the FEC—party pressure over candidates—despite the FEC's attempts to cast it otherwise, it is not corruption. As *Buckley* reiterated again and again, the concern with corruption is related to "large individual financial contributions." *Buckley,* 424 U.S. at 26, 27, 96 S.Ct. at 638–39. Party-coordinated expenditures are not large individual contributions. As required by law and demonstrated by the evidence, the hard-money contributions are not from one or a few individuals. They come from many small contributors. Even the largest contributors are statutorily limited in the amounts they may give. I cannot conclude that party contributions are akin to large individual contributions. The relationship between a party and a Member of Congress who represents that party is wholly different from the relationship between a private individual or corporation and a Member of Congress. Parties exist because of their success in electing representatives of their philosophy to legislative bodies.

The FEC contends that parties exert influence over candidates.[11] (FEC Facts

¶¶ 211–41.) The FEC's facts do suggest that the parties and their committees are involved with the candidates and their policy positions. That, however, is the nature of the party-candidate relationship and, again, highlights the paramount First Amendment concerns with respect to limiting coordinated speech.

As discussed above, a political party functions to promote political ideas and policy objectives over time and through elected officials. Given the purpose of political parties in our electoral system, a political party's decision to support a candidate who adheres to the parties' beliefs is not corruption. Conversely, a party's refusal to provide a candidate with electoral funds because the candidate's views are at odds with party positions is not an attempt to exert improper influence. A candidate who does not wish to toe the party line is not excluded from participation in the political process or even in the party process. The FEC offers factual allegations which suggest that one party or the other withheld, or attempted to withhold, campaign funds from a candidate who expressed viewpoints or campaign tactics contrary to those thought preferable by the party. (*See, e.g.,* FEC Facts ¶ 224.) The court regards those as instances of the party and the candidate exercising their First Amendment rights. A party that refuses to fund a candidate who engages in what the party deems as undesirable campaign tactics is not reflecting corruption or the appearance of corruption. Indeed, the evidence offered by the parties suggests that the parties direct their coordinated expenditure dollars to candidates who are most in need, that is, candidates for whom the money could be the difference between winning or losing.

Unable to produce admissible evidence which convinces the court that party expenditures must be limited to prevent corruption, the FEC relies on the "appearance of corruption" to discharge its

---

11. The FEC, in the factual allegations regarding this subject, combines factual assertions with argument and engages in speculation as to what could occur. Although this appears throughout the FEC's asserted facts, it is particularly acute in this section.

burden. Specifically, the FEC attempts to rely on the apparent public perception (or, perhaps, misperception) regarding the role of money in politics to establish that unlimited coordinated party expenditures cause the "appearance of corruption." (FEC Facts ¶¶ 292–302.) But, as the evidence reveals, (see Colorado Party Facts ¶¶ 49–53), the public is unaware of the nuances of campaign financing, particularly the role of hard money in coordinated campaign expenditures. If the FEC's position is correct and the public cannot distinguish hard money from soft money and the role that each plays in the system, the proper course of action is not to limit speech by permitting unnecessary and unconstitutional limitations on parties' and candidate's freedoms of speech and association but, rather, to engage in more speech to educate the public. See Linmark Assocs., Inc. v. Township of Willingboro, 431 U.S. 85, 97, 97 S.Ct. 1614, 1620, 52 L.Ed.2d 155 (1977) (citing Whitney v. California, 274 U.S. 357, 377, 47 S.Ct. 641, 649, 71 L.Ed. 1095 [1927] [Brandeis, J. concurring]). The FEC cannot rely on general public dissatisfaction with parties and politicians and the amount of money in the political process, particularly money which cannot even be used for the expenditures at issue in this case, to support its claim that the party coordinated expenditure limit serves a compelling purpose and is narrowly tailored to accomplish that purpose.

In short, the FEC has failed to offer evidence which demonstrates the compelling need for limits on political party coordinated expenditures. Only by attempting to divert the focus of the case from hard money to soft money and by seeking to broaden the definition of corruption beyond recognizable bounds does the FEC even approach the requisite showing. As Justice Kennedy said in Colorado I:

> The problem is not just the absence of a basis in our First Amendment cases for treating the party's spending as contributions. The greater difficulty posed by the statute is its stifling effect on the ability of the party to do what it exists

to do. It is fanciful to suppose that limiting party spending of the type at issue here "does not in any way infringe the contributor's freedom to discuss candidates and issues," [Buckley, 424 U.S. at 21, 96 S.Ct. at 635], since it would be impractical and imprudent, to say the least, for a party to support its own candidates without some form of "cooperation" or "consultation." The party's speech, legitimate on its own behalf, cannot be separated from speech on the candidate's behalf without constraining the party in advocating its most essential positions and pursuing its most basic goals. The party's form of organization and the fact that its fate in an election is inextricably intertwined with that of its candidates cannot provide a basis for the restrictions imposed here. See [NCPAC, 470 U.S. at 494–495, 105 S.Ct. at 1467–68.]

We have a constitutional tradition of political parties and their candidates engaging in joint First Amendment activity; we also have a practical identity of interests between the two entities during an election. Party spending "in cooperation, consultation, or concert with" a candidate therefore is indistinguishable in substance from expenditures by the candidate or his campaign committee. We held in Buckley that the First Amendment does not permit regulation of the latter, see 424 U.S. at 54–59, 96 S.Ct. at 651–54, and it should not permit this regulation of the former. Congress may have authority, consistent with the First Amendment, to restrict undifferentiated political party contributions which satisfy the constitutional criteria we discussed in Buckley, but that type of regulation is not at issue here.

Colorado I, 518 U.S. at 630, 116 S.Ct. 2309, at 2322–23, 135 L.Ed.2d 795 (Kennedy, J. concurring in judgment and dissenting in part). Because the FEC has failed to offer relevant, admissible evidence which suggests that coordinated party expenditures must be limited to prevent corruption or the appearance thereof, I conclude that summary judgment is warranted.

Accordingly, the FEC's motion for summary judgment is denied, and the Colorado Party's motion for summary judgment is granted with respect to its constitutional challenge to the Party Expenditure Provision. I therefore do not address the parties' arguments regarding vagueness.

### 4. Conclusion

Upon the foregoing findings and conclusions, it is therefore

ORDERED as follows:

1. The FEC's motion for summary judgment and to dismiss the amended counterclaim with prejudice is DENIED.

2. The Colorado Party's motion for summary judgment is GRANTED.

3. The parties' joint motion to correct the transcript is GRANTED.

4. The clerk shall forthwith enter judgment declaring that the Party Expenditure Provision, 2 U.S.C.A. § 441a(d) (West 1997), is unconstitutional and cannot be enforced against defendant.