TACHA, Circuit Judge.
Section 441a(d)(3) of the Federal Election Campaign Act, 2 U.S.C. §§ 431-455, limits the amount of money a political party may spend in coordination with its candidates for Congress. The Federal Election Commission (FEC) appeals the district court’s ruling that this limitation violates the First Amendment. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.
I.
We analyze § 441a(d)(3) within its statutory context. The Federal Election Campaign Act (FECA or “Act”), as amended in 1974, limited the amount of money that individuals, corporations, banks, labor organizations, political committees, (e.g., political action committees, or PACs), and political parties could contribute to candidates for federal office. See 18 U.S.C. §§ 608, 610 (1970 ed. Supp. IV). The Act also imposed limits on the amount these groups — and the candidates themselves— could spend in connection with a campaign for federal office. Id.
Shortly after Congress amended FECA, the Supreme Court struck down many of the Act’s expenditure limits as unconstitutional under the First Amendment’s free speech and association guarantees. Buckley v. Valeo, 424 U.S. 1, 39-59, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam) (invalidating FECA provisions limiting (1) individual expenditures independent of a candidate’s campaign, (2) a candidate’s expenditure of personal funds, and (3) overall campaign expenditures); see also Federal Election Comm’n v. National Conservative Political Action Comm., 470 U.S. 480, 497, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) (NCPAC) (invalidating FECA provision limiting independent expenditures by political committees).
However, the Court generally has upheld FECA’s contribution limits. Buckley, 424 U.S. at 28, 29, 35-36, 96 S.Ct. 612 (finding constitutional the Act’s limits on the amount individuals and political committees can contribute to a candidate for federal office); California Med. Ass’n v. Federal Election Comm’n, 453 U.S. 182, 193-99, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) (upholding limits on the amount individuals may contribute to political committees). Furthermore, the Supreme Court has recognized that “coordinated expenditures” qualify as contributions under FECA and, therefore, are subject to FECA’s contribution limits. Buckley, 424 U.S. at 46-47, 96 S.Ct. 612; NCPAC, 470 U.S. at 492, 105 S.Ct. 1459. Thus, FECA’s contribution limits apply not only when an individual or group contributes money directly to a campaign, but also when an individual or group contributes money indirectly by making expenditures coordinated with the campaign. See 2 U.S.C. § 441a(a)(7)(B)(i) (“[Ejxpenditures made by any person in cooperation, consultation, or concert with ... a candidate ... shall be considered to be a contribution to such candidate.”).
As presently codified, the Act sets the following contribution limits: A “person” is entitled to contribute $1000 to a candidate “with respect to any election for Federal office;” $5000 in any calendar year to a political committee that is not established and maintained by a national political party; and $20,000 in any calendar year to the political committees of a national political *1224 party. 2 U.S.C. § 441a(a)(l). However, no person may make contributions totaling more than $25,000 in any year. Id. § 441a(a)(3). A “multicandidate political committee” (or PAC) may contribute $5000 to a candidate with respect to any federal election; $5000 in any calendar year to any other political committee that is not established and maintained by a national political party; and $15,000 in any calendar year to the political committees of a national political party. Id. § 441a(a)(2).
National and state political parties meet FECA’s definition of “multicandidate political committees.” See id. § 441a(a)(4) (defining a “multicandidate political committee” as “a political committee ... which has received contributions from more than 50 persons, and ... has made contributions to 5 or more candidates for Federal office”). Thus, political parties ordinarily would be subject to the above dollar limits. However, Congress recognized that parties are different than PACs. Consequently, Congress exempted political parties from the Act’s general contribution limits and imposed substitute limits upon them. Id. § 441a(d)(l), (3). Section 441a(d)(3), known as the Party Expenditure Provision, provides that political parties “may not make, any expenditure in connection with the general election campaign of a candidate for Federal office” which exceeds the greater of $20,000 or 2 cents multiplied by the voting age population of the state.[1] Id. § 441a(d)(3).
II.
The prior proceedings in this case have narrowed the issues we must decide. In January 1986, Timothy Wirth, then a Democratic Congressman from Colorado, announced that he would seek Colorado’s open Senate seat in November. Several months later, before the Democratic primary or the Republican convention, the Colorado Republican Federal Campaign Committee (“Colorado Party” or “Party”) developed and aired a radio advertisement criticizing Wirth’s voting record. In its quarterly report to the FEC, the Party classified the advertisement outlay as an operating expense instead of a § 441a(d)(3) expenditure. The Colorado Democratic Party filed an administrative complaint with the FEC, alleging that the Party’s purchase of radio time was an expenditure in connection with the Senate campaign and exceeded § 441a(d)(3)’s spending limit. The FEC agreed with the Democratic Party and filed suit in district court against the Colorado Party.
On motion for summary judgment, the Party argued that the outlay did not fall within the Party Expenditure Provision because the Colorado Party did not develop the advertisement “in connection with” the campaign of any federal candidate. The Party also asserted a counterclaim, alleging that the Party Expenditure Provision violated its First Amendment rights of free speech and association. The district court narrowly interpreted § 441a(d)(3) as limiting only those expenditures that use “ ‘express words of advocacy of election or defeat.’ ” Federal Election Comm’n v. Colorado Republican Fed. Campaign Comm., 839 F.Supp. 1448, 1455 (D.Colo.1993) (quoting Buckley, 424 U.S. at 44 n. 52, 96 S.Ct. 612). Under this statutory construction, the district court found that the provision did not cover the Wirth advertisement and entered summary judgement in favor of the Party. Id. at 1456-57. Because the court resolved the dispute on statutory grounds, it did not reach the Party’s constitutional challenge. Id. at 1457.
On appeal, the FEC argued for a broader interpretation of the provision as limiting “expenditures depicting a clearly identified candidate and conveying an electioneering message.” Federal Election Comm’n v. Colorado Republican Fed. Campaign Comm., 59 F.3d 1015, 1022 (10th Cir.1995). We agreed with the FEC *1225 and thus concluded that the advertisement was subject to the limits of the Party Expenditure Provision. Id. at 1023. We also reached the constitutional challenge and held that § 441a(d)(3) did not imper-missibly burden the Party’s First Amendment rights. Id.
The Supreme Court granted certiorari “primarily to consider the Colorado Party’s argument that the Party Expenditure Provision violates the First Amendment either facially or as applied.” Colorado Republican Fed. Campaign Comm. v. Federal Election Comm’n, 518 U.S. 604, 613, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (internal quotation marks and citation omitted) (“Colorado I”). Three members of the Court found the provision unconstitutional as applied to the expenditure at issue, and four other Justices joined in this judgment. Id. at 608, 116 S.Ct. 2309.[2]
Based on the summary judgment record before itj, the plurality noted that the Colorado Party had developed and approved the advertisement script independent of any candidate for Federal office. Id. at 613-14, 116 S.Ct. 2309. In fact, at the time the advertisement was placed, the Party had not yet selected a senatorial nominee. Id. Thus, the plurality concluded that the advertisement in question was an “independent expenditure,” not a “coordinated expenditure” subject to the limits of § 441a(d)(3). Id. at 613, 116 S.Ct. 2309. As such, the expenditure was entitled to full First Amendment protection under controlling precedent. Id. at 614-15, 116 S.Ct. 2309 (citing NCPAC, 470 U.S. at 497, 105 S.Ct. 1459; Buckley, 424 U.S. at 19-21, 96 S.Ct. 612).
Having found the provision unconstitutional as applied to this particular independent expenditure, the plurality declined to reach the broader question of whether the First Amendment forbids limits on coordinated expenditures by political parties. Id. at 623, 116 S.Ct. 2309. Instead, the Court remanded the case to the district court for further proceedings, noting that “to our knowledge, this is the first case in the 20-year history of the Party Expenditure Provision to suggest that in-fact coordinated expenditures by political parties are protected from congressional regulation by the First Amendment.” Id. at 624, 116 S.Ct. 2309.
On remand, the parties compiled an extensive record, focusing exclusively on the novel constitutional question highlighted in Colorado I. On cross motions for summary judgment, the district court concluded that the FEC had “failed to offer evidence which demonstrates the compelling need for limits on political party coordinated expenditures.” Federal Election Comm’n v. Colorado Republican Fed. Campaign Comm., 41 F.Supp.2d 1197, 1213 (D.Colo.1999).[3] The court therefore declared the Party Expenditure Provision unconstitutional and entered summary judgment in *1226 favor of the Party. Id. at 1213-14. This appeal followed.
III.
, We review a decision granting summary judgment de novo, applying the same legal standard used by the district court. Mesa v. White, 197 F.3d 1041, 1043 (10th Cir.1999). In First Amendment cases, “the de novo standard is appropriate ... for the further reason that ... an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression.” Id. (internal quotation marks and citation omitted). Summary judgment is appropriate “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Fed.R.Civ.P. 56(c). •
Determining the standard of scrutiny appropriate for the constitutional analysis is more complicated than determining our standard of review. In Buckley, the Supreme Court referred generally to “the exacting scrutiny required by the' First Amendment,” 424 U.S. at 16, 96 S.Ct. 612, and added specifically “that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office,” id. at 15, 96 S.Ct. 612 (internal quotation marks and citation omitted). In Colorado I, the plurality concluded that the government must demonstrate a “compelling” interest to restrict the First Amendment freedoms of candidates and their supporters. 518 U.S. at 609, 116 S.Ct. 2309. Such language suggests “strict scrutiny” of campaign finance regulation in general.
Howuver, the Supreme Court most recently revisited the standard of scrutiny as to campaign contribution limits in particular. See Nixon v. Shrink Mo. Gov’t PAC, - U.S. —, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000). In Shrink Missowi, the Court construed a state statute that limited each person to a contribution of $1000, adjusted for inflation, in support of candidates for various statewide offices. Id. at 901-02. The Court upheld the statute against a First Amendment challenge. In doing so, the Court recognized that the Buckley distinction between (permissible) restrictions on contributions and (impermissible) restrictions on expenditures implies that different types of FECA limits require different levels of justification. Id. at 903-04. Prior to Shrink Missouri, the Court had made this implied distinction explicit in Federal Election Comm’n v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 259-60, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (“We have consistently, held that restrictions on contributions require less compelling justification than restrictions on independent spending.”). The Shrink Missouri court thus restated the standard of scrutiny for contribution limits as follows:
[Ujnder Buckley’s, standard of scrutiny, a contribution limit involving “significant interference” with associational rights could survive if the Government demonstrated that contribution regulation was “closely drawn” to match a “sufficiently important interest,” though the dollar amount of the limit need not be “fine tun[ed].”
120 S.Ct. at 904 (quoting Buckley, 424 U.S. at 25, 30, 96 S.Ct. 612).[4]
In this case, we must determine whether the FEC can justify § 441a(d)(l)’s limit on coordinated expenditures by political parties. Since FECA treats coordinated expenditures as “contributions,” 2 U.S.C. *1227 § 441a(a)(7)(B)(i), and the Court has recognized this statutory classification, NCPAC, 470 U.S. at 492, 105 S.Ct. 1459, we apply the foregoing standard to our review of the Party Expenditure Provision.
However, we admit some difficulty in applying this standard to this particular contribution limit. As noted in Shrink Missouri, the Supreme Court has found in general that contribution limits bear “more heavily on the associational right than on freedom to speak.” Shrink Mo., 120 S.Ct. at 904. This finding rested in part upon the recognition that contribution limits ordinarily “entail[] only a marginal restriction upon the contributor’s ability to engage in free communication.” Buckley, 424 U.S. at 20, 96 S.Ct. 612. In the ease of political parties, though, a limit upon the amount a party can spend in coordination with its candidates certainly entails more than a “marginal restriction” upon the party’s free speech. Indeed, in the context of an election, a party speaks in large part through its identified candidates; candidates, in significant measure, speak for their political parties.[5] We therefore question whether the contribution/expenditure dichotomy which underlies the Shrink Missouri standard applies with equal force in this case. However, we need not resolve this question definitively because the Party Expenditure Provision fails even under the more deferential standard reformulated in Shrink Missouri.
IV.
The Buckley court recognized the “prevention of corruption and the appearance of corruption” as “constitutionally sufficient justification[s]” for the regulation of campaign contributions. 424 U.S. at 25, 26, 96 S.Ct. 612. “[I]mproper influence” and “opportunities for abuse” go beyond bribery and “extend! ] to the broader threat from politicians too compliant with the wishes of large contributors.” Shrink Mo., 120 S.Ct. at 905.
To the ■ extent that large contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of representative democracy is undermined. ... Of almost equal concern as the danger of actual quid pro' quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions.... [In enacting contribution limits] Congress could legitimately conclude that the avoidance of the appearance of improper influence “is also critical ... if confidence in the system of representative Government is not to be eroded to a disastrous extent.”
Id. at 26-27, 96 S.Ct. 612 (quoting United States Civil Serv. Comm’n v. National Ass’n of Letter Carriers, 413 U.S. 548, 565, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973)).
Since Buckley, the' Court has stated that “preventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances.” NCPAC, 470 U.S. at 496-97, 105 S.Ct. 1459. While corruption or the appearance thereof are constitutionally sufficient justifications, the FEC in this case must show that political parties through their spending authority corrupt or appear to corrupt the electoral process. The opportunity for corruption or its appearance is greatest when the political spending is motivated by economic gain. As discussed below, political parties are diverse entities, one step removed from the candidate, and they exist for noneconomic reasons. Much like an advocacy group, a party functions “to disseminate political ideas, not to amass capital. The resources it has available are not a function of its success in the *1228 economic marketplace, but its popularity in the political marketplace.” See Massachusetts Citizens for Life, 479 U.S. at 259, 107 S.Ct. 616. Political parties have played a vital role in the American system of government.
[Ajstute observers[] all agree that the political party is — or should be — central to the American political system. Parties are — or should be — integral parts of all political life, from structuring the reasoning and choice of the electorate, through all facets of campaigns and seemingly all facets of the government, to the very possibility of effective governance in a democracy.
John H. Aldrich, Why Parties: The Origin and Transformation of Political Parties in America 18 (1995). From the birth of this republic into the 21st century, political parties have provided the principal forum for political speech and the principal means of political association. See, e.g., Clinton Rossiter, Parties and Politics in America 1 (1960) (declaring that there is “[n]o America without democracy, no democracy without politics, and no politics without parties....”). Political speech and association, unfettered by unnecessary government interference, are the lifeblood of a free and independent republic. We need only look to the struggling new republics of our time to confirm this principle.
In its FECA enactments, Congress certainly recognized the importance of parties. See H.R. Conf. Rep. No. 94-1057, at 58 (1976), 1976 U.S.C.C.A.N. 946, at 973 (acknowledging that political parties fulfill a “unique role in the political process”), S Rep. No. 93-689, at 3,7 (1974),1974 U.S.C.C.A.N. 5587, at 5589, 5593 (declaring that political parties “serve as a legitimate pooling mechanism for private contributions to candidates in general elections” and concluding that “a vigorous party system is vital to American politics”).
The Supreme Court likewise has acknowledged the role of the party. See, e.g., Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214, 222-25, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989), Tashjian v. Republican Party of Conn., 479 U.S. 208, 214-15, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986); see also Davis v. Bandemer, 478 U.S. 109, 144-45, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) (O’Connor, J., concurring in the judgment) (“There can be little doubt that the emergence of a strong and stable two-party system in this country has contributed enormously to sound and effective government. The preservation and health of our political institutions, state and federal, depends to no small extent on the continued vitality of our two-party system, which- permits both stability and measured change.”). Indeed, all three branches of government, to an important extent, rely on the speech and associational functions of parties to assure the orderly conduct of elections, appointments and governance in general.
In Colorado I, the plurality acknowledged that they “are not aware of any special dangers' of corruption associated with political parties” in the context of independent spending. 518 U.S. at 616, 116 S.Ct. 2309. Remand has only confirmed that conclusion for this court in the context of coordinated spending. We are convinced that Shrink Missouri, decided during the pendency of this appeal, does not alter this conclusion. As we discuss later, infra note 9, Shrink Missouri involved a straightforward application of Buckley to uphold counterpart state contribution limits. The Court did not confront the more difficult issue of whether limits on coordinated spending by political parties are consistent with the First Amendment.
The FEC submits essentially three theories on how coordinated spending by political parties corrupts, or creates the appear anee of corrupting, our electoral system. Were any of these theories valid, one would have to question why Congress permits any coordinated expenditures by political parties, let alone removes them from the Act’s more restrictive limits. At a minimum, Congress has signaled that po *1229 litical parties are different than individuals and other organizations.
A.
The FEC first argues that contributors to a political party — individuals or PACs — can corrupt (or appear to corrupt) the political process through their influence over a party. Under this theory, a contributor gives so much money to a party that the party grows beholden to the donor. The party then exercises its coordinated expenditure authority to either support or neglect those candidates who endorse or eschew the interests of the large contributor. By limiting the spending authority of a political party, the Party Expenditure Provision limits the financial leverage a party can exert on behalf of a generous donor.
To support this theory, the FEC submitted the declaration of former Senator Paul Simon and other evidence concerning meetings between party donors and federal officeholders. In his declaration, Simon describes a meeting of the Democratic Caucus where members discussed an amendment to a bill that was already before the House-Senate Conference Committee. Simon opposed the amendment because it had not passed through the typical committee hearing process. The amendment' clearly benefitted one particular' corporation, and Simon referenced published reports that this corporation had contributed $1.4 million in the last election cycle to incumbent members of Congress. One of Simon’s senior colleagues spoke out in favor of the amendment, saying: “I’m tired of Paul always talking about special interests; we’ve got to pay attention to who is buttering our bread.” R. at 466.
This anecdote, along with the FEC’s other evidence, might say something about corporate influence over the legislative process. But this evidence does not demonstrate that 'parties undermine the integrity Of the electoral process. Corporate giving may indeed influence legislators, and Congress recognized this danger in enacting FECA. See, e.g., Federal Election Comm’n v. National Right to Work Comm., 459 U.S. 197, 209-10, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982) (“[FECA] reflects a legislative judgment that the special characteristics of the corporate structure require particularly careful regulation.”). Consequently, corporations may not make contributions or expenditures in connection with any federal election, 2 U.S.C. § 441b(a), and PACs organized by such corporations are subject to strict dollar limits, id. § 441a(a)(2).
The FEC may find these limits inadequate to eliminate all corporate sway over members of Congress. If so, this argument should be addressed to Congress, not to this court in this case. We will not validate limits on the protected speech of a political party as a back-door means of stemming corporate involvement in the legislative process. See Massachusetts Citizens for Life, 479 U.S. at 265, 107 S.Ct. 616 (“Where at all possible, government must curtail speech only to the degree necessary to meet the particular problem at hand, and must avoid infringing on speech that does not pose the danger that has prompted regulation.”).
To overcome a constitutional challenge, the FEC .must demonstrate that a restriction on coordinated expenditures by political parties is “closely drawn” to match important government interests. Shrink Mo., 120 S.Ct. at 904 (internal quotation marks and citation omitted). However, ..many of the interests identified by the FEC are hardly vindicated by this restriction. For example, the party may become an independent power source, seek contributions from interest groups and attempt to influence members’ votes regardless of any limitation on coordinated expenditures. After all, Colorado I confirms that a par.ty may make unlimited expenditures independent of its candidates. Moreover, as the district court observed, many of the activities the FEC wishes to curtail are consistent with our model of representative democracy. Colorado Republican *1230 Fed. Campaign Comm., 41 F.Supp.2d at 1210-13.
The FEC insists that we must also consider the corrupting influence of corporate, bank and union money contributed to political parties outside of FECA’s limits, so-called “soft money” contributions. In the parlance of campaign finance, FECA regulates only “hard money.” Hard money is the common term for the limited and disclosed funds parties raise from individuals and PACs in conformity with the FECA limits outlined in the opening section. Parties may use only hard money to expressly advocate the election or defeat of federal candidates, and corporations, national banks and labor organizations cannot make hard money contributions to political parties. 2 U.S.C. § 441b(a).
FECA does not regulate so-called “soft money” contributions. An individual or group may contribute unlimited amounts of soft money to a political party. However, the party may use soft money only for limited activities, such as electing candidates for state office, see id. § 431(8)(A)(i), or for voter registration and “get-out-the-vote” drives, see id. § 431(8)(B)(xii). Thus, unregulated soft money contributions may not be used to influence d federal campaign, except through the limited party-building activities specifically designated in the statute.
The FEC contends that large soft money donors purchase influence over a political party, and the Party Expenditure Provision must be maintained to ensure that a party does not pressure its candidates to heed this influence. We appreciate the FEC’s concern over soft money, but this proceeding does not present the opportunity for soft money reform. In this case, we address only the constitutionality of § 441a(d)(3)’s limit on hard money coordinated expenditures. The FEC has presented no evidence to suggest that parties have illegally utilized soft money for hard money spending. Absent such a showing, we will not allow the appearance of soft money excess to justify a limit on hard money expenditures.[6]
B.
The FEC next contends that unscrupulous party officials can utilize the party’s coordinated spending authority to further their personal interests or those of an unrepresentative party faction. Under this theory, the cap on coordinated expenditures limits the party elite from corrupting (or appearing to corrupt) the electoral process through improper pressure upon its own candidates. The FEC submits evidence that a small group of incumbent officeholders controls coordinated spending decisions, and certain incumbents have utilized this power to support candidates in their home states.
This theory, unlike the first, has the appeal of directly targeting the source of alleged corruption. If party elites corrupt the electoral process, then a limit on coordinated spending directly curtails one means of this alleged corruption. However, the premise of this theory, namely that *1231 political parties can corrupt the electoral system by influencing their candidates’ positions, gravely misunderstands the role of political parties in our democracy.[7]
To state the matter with utmost simplicity: political parties, with all their well-known human and structural shortcomings, are the only devices thus far invented by the wit of Western man which with some effectiveness can generate countervailing collective power on behalf of the many individually powerless against the relatively few who are individually — or organizationally — powerful.
Walter Dean Burnham, Critical Elections and the Mainsprings of American Politics 133 (1970). Political parties today represent a broad-based coalition of interests, and there is nothing pernicious about this coalition shaping the views of its candidates. Parties are simply too large and too diverse to be corrupted by any one faction. Evidence in the record demonstrates that the parties’ hard money comes from individual donors who give, on average, less than $40. As amici recognized in Colorado I, the old rule of sanitary engineers applies here: the solution to pollution is dilution. Amicus Curiae Br. of the Committee for Party Renewal, Colorado I, 518 U.S. 604, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (No. 95-489).
Even if, as the FEC contends, party leaders subvert the greater will of the rank-and-file membership, we trust the members to replace their leaders. It is true that political parties have been involved in wrongdoing, dating back to the Tammany Hall machine. However, the electoral and litigation processes have always managed to right these wrongs. Given the importance of political parties to the survival of this democracy, we reject the notion that a party’s influence over the positions of its candidates constitutes “a subversion of the political process.” NCPAC, 470 U.S. at 497, 105 S.Ct. 1459.
C.
Finally, the FEC contends that the Party Expenditure Provision must be upheld to prevent evasion of the Act’s other contribution limits. For example, an individual may contribute only $1000 directly to a candidate for federal office, 2 U.S.C. § 441a(a)(l)(A), but may contribute up to $20,000 of hard money to a national political party, id. § 441a(a)(l)(B). The FEC claims that if the coordinated expenditure limit is struck down, individuals will circumvent the $1000 limit by contributing $20,000 to a political party with the expectation that this money be used to support a particular candidate.
*1232 . The Supreme Court has recognized that certain contribution limits serve to protect the integrity of others. CMA, 453 U.S. at 198-99, 101 S.Ct. 2712; Buckley, 424 U.S. at 38, 96 S.Ct. 612. We agree with the FEC that if an individual used the party as a conduit to channel money to specified candidates, this would certainly threaten the integrity of the individual contribution limit. However, Congress evidently foresaw this avenue of abuse and foreclosed it. The Act provides that individual “contributions which are in any way earmarked or .otherwise directed through an intermediary or conduit” to a particular candidate shall be treated as contributions from the original source to the candidate. 2 U.S.C. § 441a(a)(8); see 11 C.F.R. § 110.6(b)(1) (2000) (defining “earmarked” as any “designation, instruction, or encumbrance, whether direct or indirect, express or implied, oral or written, which results in all or any part of a contribution being made to ... a clearly identified candidate”).
Under this provision and its expansive agency interpretation, the FEC certainly has the authority to ensure that individuals do not use political parties to circumvent the Act’s other contribution limits. Vigilant enforcement of § 441a(a)(8), rather than a severe abridgement of party speech, is a more appropriate and direct means to safeguard the integrity of the individual contribution limits.[8]
V.
We recognize' that the Supreme Court typically has upheld limits upon political contributions and that FECA treats coordinated expenditures by a political party as contributions. However, in this case, a simple cubbyholing of constitutional values under the labels “contribution” and “expenditure” cheapens the currency. See, e.g., National Ass’n for the Advancement of Colored People v. Button, 371 U.S. 415, 429, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (stating that the government “cannot foreclose the existence of constitutional rights by mere labels”). We also recognize that the Buckley court was concerned about the “real or imagined coercive influence of large financial contributions on candidates’ positions.”. Id. at 25, 96 S.Ct. 612. But the Buckley court so defined corruption for the purpose of reviewing limits upon giving and spending by individuals, PACs and candidates. Because the Buckley litigants did not challenge the Party Expenditure Provision on First Amendment grounds, the Court said nothing about the First Amendment implications of restricting party speech on behalf of its candidates. Id. at 58 n. 66, 96 S.Ct. 612. To encompass political parties within the Buckley language on corruption would require a real extension of this precedent. Such an extension is not warranted by the Court’s post -Buckley FECA jurisprudence and would betray the historic importance of political parties. See Colorado I, 518 U.S. at 629, 116 S.Ct. 2309 (Kennedy, J., concurring in the judgment and dissenting in part) (“In my view, we should not transplant the reasoning of eases upholding ordinary contribution limitations to a case involving FECA’s restrictions on political party spending.”).
In sum, we conclude that the Party Expenditure Provision constitutes a “significant interference” with the First Amendment rights of political parties. Buckley, 424 U.S. at 25, 96 S.Ct. 612 (internal quotation marks and citation omitted). This interference effects more than a “marginal restriction upon the [parties’] ability to engage in free communication.” *1233 Id. at 20, 96 S.Ct. 612. The FEC has not demonstrated on remand that coordinated spending by political parties corrupts, or creates the appearance of corrupting, the electoral process.[9] Therefore, § 441a(d)(3)’s limit on party spending is not “closely drawn” to the recognized governmental interest but instead constitutes an “unnecessary abridgment” of First Amendment freedoms.[10] Id. at 25, 96 S.Ct. 612.
AFFIRMED.

. A separate provision, § 441a(d)(2), limits party expenditures in connection with Presidential campaigns. Our analysis and holding apply only to party spending in connection with congressional races.

. The four Justices who concurred in the judgment also dissented in part, urging the Court to resolve the Party’s facial challenge to § 441a(d)(3). Colorado I, 518 U.S. at 626, 116 S.Ct. 2309 (Kennedy, J., concurring in the judgment and dissenting in part); id. at 631, 116 S.Ct. 2309 (Thomas, J., concurring in the judgment and dissenting in part). Chief Justice Rehnquist and Justice Scalia joined Justice Kennedy’s opinion in full and Justice Thomas’s opinion in part.

. The plurality in Colorado I noted that neither the parties nor the lower courts had "considered whether Congress would have wanted the Party Expenditure Provision's limitations to stand were they to apply only to coordinated, and not to independent, expendi-lures.” 518 U.S. at 625, 116 S.Ct. 2309. Thus, the plurality directed the parties on remand to brief this "nonconstitutional ground for exempting party coordinated expenditures from FECA limitations." Id. at 625-26, 116 S.Ct. 2309. On remand, the Colorado Party argued that FECA's unconstitutional limit on a party's independent expenditures could not be severed from its limit on a party's coordinated spending. Thus, the Party insisted that § 441a(d)(3) must fail as a matter of statutory construction. The district court disagreed and found that the Party Expenditure Provision, as it applies to coordinated expenditures, remained in effect after Colorado I. 41 F.Supp.2d at 1207. On appeal, the parties raise only the constitutional question.

. We note that the Court appears internally divided over the appropriate level of scrutiny. Compare Shrink Mo., 120 S.Ct. at 917 (Thomas, J., dissenting) (criticizing "the majority’s refusal to apply strict scrutiny to contribution limits”), with id. at 911 (Breyer, J., concurring) (concluding that, in this case, “there is no place for a strong presumption against constitutionality, of the sort often thought to accompany the words 'strict scrutiny' ”).

. Notwithstanding the dissent's charge, we do not conclude that parties and their candidates share an identity of interest. We, like the plurality in Colorado I, will not assume any “metaphysical identity” between party and candidate. We simply make the common sense observation that limiting a party’s speech through its identified candidates imposes more than a marginal restriction upon that party’s First Amendment freedoms.

. As part of its evidence below, the FEC submitted newspaper articles and editorials concerning soft and hard money. The district court did not make an evidentiary ruling on any individual article, but it did make general comments concerning the admissibility and weight of the articles. See, e.g., Colorado Republican Fed. Campaign Comm., 41 F.Supp.2d at 1200 ("The FEC makes numerous factual assertions, for example, based on reports in newspaper articles. Except as otherwise noted, the discussion which follows simply ignores the mass of irrelevant and/or inadmissible evidence in the record....”). It appears to us that the district court considered all the submitted evidence, while acknowledging evidentiary weaknesses therein. Thus, we also consider the full record before us. We note, however, that media accounts documenting a vague (though visceral) public cynicism about campaign finance prove too little. We should not allow generic public dissatisfaction to support the restriction of political speech. See NCPAC, 470 U.S. at 499-500, 105 S.Ct. 1459 (concluding that "newspaper articles and polls purportedly showing a public perception of corruption” fall “far short” of the required evidence to justify a limitation on the independent expenditures of PACs).

. The dissent mischaracterizes the object of our criticism. According to the dissent, we accuse Congress of undervaluing the role of the party. This is simply not true. As we noted earlier, supra Part IV, Congress has recognized the party’s unique role in the political process. The plurality in Colorado I found that the legislative history of FECA "rather than indicating a special fear of the corruptive influence of political parties ... demonstrates Congress’ general desire to enhance what was seen as an important and legitimate role for political parties in American elections.” 518 U.S. at 618, 116 S.Ct. 2309.
The object of our criticism is the FEC. Defying this clear congressional intent, the FEC argued before this court that Congress limited a party’s coordinated expenditures out of a fear of corruption. The Supreme Court in this case has suggested otherwise. "[Tjhis Court’s opinions suggest that Congress wrote the Party Expenditure Provision not so much because of a special concern about the potentially ‘corrupting’ effect of party expenditures, but rather for the constitutionally insufficient purpose of reducing what it saw as wasteful and excessive campaign spending.” Id. We therefore do not take issue with Congress on this point but rather reject the FEC’s post hoc rationalization for this particular provision.
Nevertheless, in construing an enactment of Congress, we must necessarily review some judgments made by the legislative body. But that, of course, is our fundamental duty. See Marbury v. Madison, 1 Cranch 137, 177, 2 L.Ed. 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.”). We are mindful of the need for deference to Congress in this particular arena and appreciate the dissent’s repeated reminders on this count. However, such deference must ultimately give way to our constitutional obligation.

. We profess some confusion at the dissent's analysis on this point. The dissent maintains that § 441a(a)(8) operates only as a disclosure provision, and.that disclosure alone is a partial measure that may be supplemented with valid contribution ceilings. We agree that disclosure is only a partial measure, but § 441a(a)(8) does not stop at disclosure. All earmarked contributions must be disclosed, and such, contributions are then subject to the strict contribution ceilings under the Act. Thus, while § 441a(a)(8) does provide for disclosure, this disclosure then triggers enforcement of the concomitant individual contribution limit .upheld in Buckley.

. The dissent contends that we betray the evidentiary threshold applied in Shrink Missouri. As the dissent accurately recounts, the Shrink Missouri court did caution against too rigorous an evidentiary standard in the context of campaign finance. However, those words of caution must be read in light of the particular challenge before the Court in that case. The state provision before the Court in Shrink Missouri limited each person to a contribution of $1000, adjusted for inflation, in support of candidates for various statewide offices. The Court found that this provision bore a "striking resemblance to the limitations sustained in Buckley.” Shrink Mo., 120 S.Ct. at 908. As a consequence, the Court ultimately concluded that "[t]here is no reason in logic or evidence to doubt the sufficiency of Buckley to govern this case.” Id. at 910.
Since the case “d[id] not present a close call,” the Court declined any "further definition” of the government’s evidentiary obligation. Id. at 907. However, the Court did indicate that there might be "need for a more extensive evidentiary documentation if petitioners had made any showing of their own to cast doubt on the apparent implications of Buckley's evidence.” Id. at 908. In our judgment, the Colorado Party has amply demonstrated that the evidence before the Buckley court is largely inapposite to the constitutionality of this provision. As noted earlier, the Buckley litigants did not challenge the Party Expenditure Provision on First Amendment grounds. Therefore, the Court said nothing about the First Amendment implications of restricting party speech through its candidates.
The Shrink Missouri court essentially incorporated by reference the Buckley evidence, because the disposition amounted to a routine application of the Buckley precedent. As we have demonstrated, this case does not involve a routine application of Buckley. Therefore, it was incumbent upon the FEC to make a more extensive evidentiary showing, which they failed to do.

. In Colorado I, the plurality indicated that the more restrictive limits upon coordinated spending by a "multicandidate political committee,” see § 441a(a)(2), would apply to political parties if the entire Party Expenditure Provision were struck down. 518 U.S. at 625, 116 S.Ct. 2309. Heeding this signal from the Court, the Party on remand challenged all FECA limits to the extent they restrict coordinated spending by political parties. The district court did not strike § 441a(a)(2) as applied to political parties, and we decline to do so as well. The record contains no evidence of a credible threat by the FEC to enforce this provision against political parties. Therefore, this particular issue is not ripe for our resolution. See Renne v. Geary, 501 U.S. 312, 321-22, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991) (finding no justiciable controversy in a First Amendment political speech case where there was "no factual record of an actual or imminent application” of the challenged provision).