SEYMOUR, Chief Judge,
dissenting.
The majority opinion is fundamentally flawed in several aspects. First, the discussion and analysis are permeated with and skewed by the majority’s determination to substitute its judgment for that of Congress on quintessentially political matters the Supreme Court has cautioned courts to leave to the legislative process. In so doing, the majority creates a special category for political parties based on its view of their place in American polities, a view at odds with history and with legislation drafted by politicians. The majority supports its decision to accord political parties an exemption from contribution limits Congress believed necessary to protect the integrity of the democratic political process by discounting the type of evidence the Supreme Court has recently held sufficient to substantiate congressional concerns,' and by relying instead on evidence the Court has expressly discounted. Accordingly, I respectfully dissent.
I
As originally enacted, the Federal Election Campaign Act (FECA or the Act), 2 U.S.C. §§ 431-455, placed limits on both political contributions and expenditures. *1234 The primary interest to be served by these limitations was “the prevention of corruption and the appearance of corruption spawned by the real or imagined coercive influence of large financial contributions on candidates’ positions and on their actions if elected to office.” Buckley v. Valeo, 424 U.S. 1, 25, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). In Buckley, the Supreme Court was faced with First Amendment challenges to several sections of FECA and drew a distinction for purposes of First Amendment analysis between expenditures and contributions. The Court viewed limits on expenditures as a direct restraint on political speech but characterized contribution limits as entailing only a marginal restriction. Accordingly, the Court upheld the $1000 limit on contributions by individuals and groups to a particular candidate or authorized campaign committee for any single election, id. at 23-35, 96 S.Ct. 612, the $5000 limit on contributions by a political committee to a single candidate, id. at 35-36, 96 S.Ct. 612, and the $25,000 limit on total annual contributions by an individual, id. at 38, 96 S.Ct. 612.
The Court reached a different result with respect to limits on expenditures and held unconstitutional the $1000 limit on independent expenditures for communications advocating the election or defeat of an identified candidate. Id. at 39-51, 96 S.Ct. 612. The Court also struck down the ceiling on a candidate’s personal expenditures as unsupported by the governmental interest in preventing actual and apparent corruption, id. at 51-54, 96 S.Ct. 612, and invalidated that section of the Act limiting overall campaign expenditures by candidates for federal office, id. at 54-58, 96 S.Ct. 612.
As indicated by Buckley, FECA regulates two types of expenditures: those that are coordinated with a candidate and those that are made independently. Coordinated expenditures are considered contributions under section 441a(a)(7)(B)(i) and therefore may be subject to limits not permissible with respect to independent expenditures. Prior to the Supreme Court ruling in this case, see Colorado Republican Fed. Campaign Comm. v. Federal Election Comm’n, 518 U.S. 604, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996), the FEC had construed FECA as requiring that all party expenditures be deemed coordinated.
The instant appeal concerns section 441a(d)(3),[1] a provision of the Act not at issue in Buckley, which limits the amount a committee for a political party can spend in connection with the general election campaign of a candidate for federal office. The expenditure at issue was made by the Colorado Republican Federal Campaign Committee for a radio advertisement criticizing an announced Democratic candidate that aired before either party had actually nominated senatorial candidates. In line with the FEC’s position, the district court in its original opinion held that the expenditure was coordinated even though no Republican candidate had been nominated at the time. Nonetheless the court ruled that the expenditure did not violate the Act, holding that because it did not constitute express advocacy, it was not made “in connection with” the Republican candidate within the meaning of section 441a(d)(3). See Federal Election Comm’n v. Colorado *1235 Republican Fed. Campaign Comm., 839 F.Supp. 1448 (D.Colo.1993).
On appeal, this court disagreed and held that section 441a(d)(3) applied to coordinated spending that involved a clearly identified candidate and an electioneering message without regard to whether the message constitutes express advocacy. See Federal Election Comm’n v. Colorado Republican Fed. Campaign Comm., 59 F.3d 1015 (10th Cir.1995). We further held that the limit imposed by the section on coordinated expenditures did not violate the First Amendment.
In a fractured opinion, the Supreme Court vacated and remanded. See Colorado Republican Fed. Campaign Comm., 518 U.S. 604, 116 S.Ct. 2309, 135 L.Ed.2d 795. The plurality opinion of Justice Breyer, joined by Justices O’Connor and Souter, rejected the. FEC’s argument that all expenditures by political parties must be deemed coordinated, and held that the expenditure here was in fact independent and that a limit on independent expenditures by political parties was unconstitutional under Buckley. In so doing, the plurality emphasized “the fundamental constitutional difference” between independent expenditures and contributions to a candidate to be spent on his campaign. Id. at 614-15, 116 S.Ct. 2309. The plurality held that the government’s interest in preventing corruption and the appearance of corruption was not sufficient to justify the restriction on independent spending, observing that while the danger of a political quid pro quo was not eliminated, that danger was alleviated by the absence of prearrangement and coordination. The plurality did not reach the issue of whether FECA’s limit on coordinated expenditures by political parties is facially invalid under the First Amendment, pointing out that the issue had not been adequately developed in the lower courts.
Justices Kennedy, Rehnquist, Scalia, and Thomas agreed with the plurality but would have gone further to hold the spending limit invalid as applied to all expenditures, independent and coordinated. Justice Thomas, standing alone, also advocated the abandonment of the analysis in Buckley altogether. Justices Stevens and Ginsburg dissented on the ground that all money spent by a political party should be deemed a contribution to the campaign and that FECA’s limits on spending by political parties are constitutional.
On remand, this court determined that factual evidence might be relevant to the issues yet to be determined and sent the case back to the district court for further proceedings. See Federal Election Comm’n v. Colorado Republican Fed. Campaign Comm., 96 F.3d 471 (10th Cir.1996). The district court held the Act’s limits on all spending by political parties facially invalid. See Federal Election Comm’n v. Colorado Republican Fed. Campaign Comm., 41 F.Supp.2d 1197 (D.Colo.1999). In so doing, the court referred to the material supplied by the FEC in support of the constitutionality of section 441a(d)(3) as lacking “any attention to elementary evidentiary requirements, such as authentication (Fed.R.Evid.901), or evidentiary limitations, such as the rule against hearsay (Fed.R.Evid.801).” Id. at 1200. .Accordingly, the court “simply ignore[d] the mass of irrelevant and/or inadmissible evidence in the record and recite[d] facts which [it] regarded] as having some significance to the questions before the -court.” Id. at 1200-01. The court held that under the standard established by the Supreme Court, the FEC must demonstrate that the limit serves a compelling interest and is narrowly tailored. Id. at 1208. The court further held that the FEC had failed the test because it had offered no evidence of quid pro quo corruption, stating that mere access does not constitute corruption.
II
While the appeal of this district court ruling was pending, the Supreme Court decided a case addressing contribution limits at the state level that were based on the “proposition that large contributions *1236 raise suspicions of influence peddling tending to undermine citizens’ confidence ‘in the integrity of ... government.’ ” Nixon v. Shrink Missouri Gov’t PAC, — U.S. -, -, 120 S.Ct. 897, 902, 145 L.Ed.2d 886 (2000) (quoting Shrink Missouri Gov’t PAC v. Adams, 5 F.Supp.2d 734, 738 (E.D.Mo.1998)). In upholding the contribution limits at issue, the Court addressed several issues relevant to the instant appeal. The Court’s analysis thus requires more than the perfunctory nod given it by the majority.
In Shrink Missouri the Court addressed the standard applicable to a claim that a contribution limit violates the First Amendment and reiterated the line it had drawn in Buckley between limits on expenditures and limits on contributions as they impact speech rights. Shrink Missouri, 120 S.Ct. at 903. Significantly, as the majority grudgingly acknowledges, the Court reaffirmed and expanded on Buckley ’s distinction
between expenditure and contribution limitations in their impacts on the association right. While an expenditure limit “precludes most associations from effectively amplifying the voice of their adherents,” (thus interfering with the freedom of the adherents as well as the association) the contribution limits “leave the contributor free to become a member of any political association and to assist personally in the association’s efforts on behalf of candidates.”
Id. at 903-04 (citations omitted) (emphasis added). The Court reiterated and expressly applied to associational rights its holdings that “ ‘restrictions on contributions require less compelling justification than restrictions on independent spending,’ ” id. at 904, and that “a contribution limit involving ‘significant interference’ with associational rights could survive if the Government demonstrated that contribution regulation was ‘closely drawn’ to match a ‘sufficiently important interest,’ ” id. (citations omitted).
The Court in Shrink Missouri also addressed the governmental interest furthered by contribution limits. The Court reiterated its prior cases holding that preventing corruption and the appearance of corruption are constitutionally sufficient to justify the abridgement of the associational right, pointing out that “[cjorruption is a subversion of the political process. Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns.” Shrink Missouri, 120 S.Ct. at 905 (quoting Federal Election Comm’n v. National Right to Work Comm., 459 U.S. 197, 208, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982)) (emphasis added).
In speaking of “improper influence” and “opportunities for abuse” in addition tó “quid pro quo arrangements,” we recognized a concern not confined to bribery of public officials, but extending to the broader threat from politicians too compliant with the wishes of large contributors. These were the obvious points behind our recognition that the Congress could constitutionally address the power of money to “influence government action” in ways less “blatant and specific” than bribery.
Id. (quoting Buckley, 424 U.S. at 28, 96 S.Ct. 612). The Court observed that there is “no serious question” about the legitimacy of the governmental interest in preventing corruption and its appearance. Id.
The Court then addressed and rejected the lower court’s conclusion that the state had “fail[ed] to justify the invocation of those interests with empirical evidence of actually corrupt practices or of a perception among Missouri voters that unrestricted contributions must have been exerting a covertly corrosive influence.” Id. at 906. The Court’s discussion of the requisite evidentiary showing is directly relevant here in view of the majority’s conclusion that the FEC has failed to meet its burden with respect to the contribution limit before us. The Court began its analysis by pointing out:
*1237 The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised. Buckley demonstrates that the dangers of large, corrupt contributions and the suspicion that large contributions are corrupt are neither novel nor implausu ble. The opinion noted that “the deeply disturbing examples surfacing after the 1972 election demonstrate that the problem [of corruption] is not an illusory one.”
Id. (quoting Buckley, 424 U.S. at 27 & n. 28, 96 S.Ct. 612). The Court also rejected the argument that the evidentiary showing held sufficient in Buckley had subsequently been supplemented by a new requirement that the government “demonstrate that the recited harms are real, not merely conjectural.” Id. at 907. In so doing, the Court distinguished between independent expenditure limits and contribution limits, implying that because limits on contributions are directly related to preventing corruption they may be assumed to be necessary absent convincing evidence to the contrary. Id.
The Court then set out the evidence supporting the contribution limit in that case, which did “not present a close call” requiring further definition of the state’s evidentiary obligation. Id. This - evidence consisted of an affidavit from a state lawmaker stating that “large contributions have the real potential to buy votes,” id. (internal quotation omitted), newspaper reports of large contributions, and anecdotal evidence, as well as a statewide vote indicating a public perception that limits were necessary. Id. at 907-08. The'Court acknowledged that more extensive documentation might be needed if the state had made a showing
to cast doubt on the apparent implications of Buckley’s evidence and the record here, but the closest respondents come to challenging these conclusions is their invocation of academic studies said to indicate that large contributions to public officials or candidates do not actually result in changes in candidates’ positions .... Given the conflict among these publications, and the absence of any reason to think that public perception has been influenced by the studies cited by respondents, there is little reason to doubt that sometimes large contributions will work actual corruption of our political system, and no reason to question the existence of a corresponding suspicion among voters.
Id. at 908.
III
An evaluation of the majority’s analysis in light of Shrink Missouri reveals that the majority opinion is replete with instances in which Congressional assessments and priorities are criticized and disregarded based on the majority’s view of the role political parties should play in the American political process and how best to promote that role. The majority accepts, as it must, that the prevention of both corruption and the appearance of corruption is a legitimate justification for impinging on First Amendment rights. Nonetheless the majority essentially eviscerates that interest by reweighing the balance struck by Congress in order to elevate what' the majority believes to be the paramount interest political parties have in making unlimited coordinated contributions.
In my judgment, the majority has crossed the line between assessing the legal merits of a First Amendment challenge and imposing its own political judgments. A court owes “deference to a congressional determination of the need for a prophylactic rule where the evil of potential corruption had long been recognized.” Shrink Missouri, 120 S.Ct. at 906 n. 5. “Where a legislature has significantly greater institutional expertise, as, for example, in the field of election regulation, the Court in practice defers to empirical legislative judgments.... ” Id. at 912 (Breyer, J., concurring). “[T]he legislature understands the problem — the threat to elector *1238 al integrity, the need for democratization — better than do we. We should defer to its political judgment that unlimited spending threatens the integrity of the electoral process.” Id. at 913.
Rather than deferring, the majority substitutes its view for that of Congress and levels a broad-based attack on the contribution limit at issue. It concludes that the FEC has failed to provide adequate evi-dentiary support for the limit, that in imposing the limit Congress “gravely misunderstood] the role of political parties in our democracy,” maj. op. at 1231, that the provision cannot be supported as a necessary component in the overall regulatory scheme, and that the same result can be obtained by the less intrusive reporting requirements of section 441a(a)(8). In so doing, the majority requires an improperly demanding level of proof from the FEC to support a contribution limit the Supreme Court has told us is presumably justified. The majority disregards evidentiary material expressly cited by the Court as sufficient to justify a contribution limit, yet relies on disputed academic articles of the type the Court expressly held insufficient to cast doubt on the validity of the justification. Finally, by immunizing political parties from contribution limits designed to prevent corruption, the majority ignores the Court’s directive that courts not “second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared.” Shrink Missouri, 120 S.Ct. at 906 n. 5.
The premise for the majority’s result is its view of the “vital role” that political parties have played in the American system of government. Maj. op. at 1227-28. While there is no doubt that parties play an important role in American politics, there is also ample support for the legislative determination that if left unchecked, parties can exert a corrupting influence on democratic processes or, equally importantly, appear to do so.[2]
In formulating contribution limits, Congress did in fact recognize the role political parties play in American politics and accorded them special treatment by permitting them to make coordinated expenditures on behalf of their federal candidates far in excess of the limits imposed on others, see 2 U.S.C. § 441a(d)(l), and by permitting adjustment for inflation, see id. § 441a(c). Indeed, the majority cites the legislative history accompanying these provisions as evidence of Congressional recognition that parties play a unique role in the political process. See H.R. Conf. Rep. No. 94-1057, at 58-59 (1976), reprinted in 1976 U.S.C.C.A.N. 946, 973-74. However, other legislative material reveals that Congress wanted to ensure that “party assistance [would] actually represente ] the involvement of many voters and not merely the influence of a wealthy few.” S.Rep. No. 93-689 (1974), reprinted in 1974 U.S.C.C.A.N. 5587, 5594. The FECA amendments of 1974 were intended to “prevent[ ] evasion of the individual contribution limits by persons funneling large gifts through party committees; each person’s donation to party funds used to assist federal candidates under this special provision must not exceed the maximum amount he could give directly to a candidate.” Id.
Significantly, these Congressional remarks appear in a discussion of legislation intended to strengthen political parties by promoting the pooling of resources from many small contributors, building coalitions of voters, keeping candidates responsible to the electorate, and increasing party resources for important party operations between elections. See id. at 5593-94. Indeed, Amici Democratic Senatorial Campaign Committee and Democratic Congressional Campaign Committee argue persuasively that during the past twenty years political parties have recovered dramatically from a prolonged period of decline due in large part to the FECA *1239 provisions limiting contributions and expenditures, which in turn encourage parties to deploy their resources in other party-building functions that ultimately enhance their role in the political process. Whether one accepts this argument or not, it clearly illuminates the fact that determining which measures suitably balance the nurture of political parties and the prevention of their use as tools of corruption is a matter for the legislative rather than the judicial process.
The majority prefaces its analysis -with a discussion voicing reservations on whether the standard set out in Shrink Missouri for assessing contribution limits should apply to political parties. See maj. op. at 1226-27. Under that test, a contribution limit survives a First Amendment challenge if the Government demonstrates that it was closely drawn to match a sufficiently important interest. Shrink Missouri, 120 S.Ct. at 904. As an initial matter, the majority is simply mistaken in asserting that the Court in either Buckley or Shrink Missouri analyzed contribution limits more closely when they affected associational rights than when they affected speech rights. To the contrary, as discussed above, after setting out the Buckley analysis in the context of restraints on speech, the Court in Shrink Missouri expressly stated that it had “flagged a similar difference between expenditure and contribution limitations in their impacts on the association right.” Id. While recognizing that contribution limits have a greater impact on associational rights than on speech rights, the Court nonetheless reiterated its past holdings that expenditure and contribution' limits are governed by differing standards even when they affect associational rights. Id. It is beyond quibble that the Court has drawn a distinction for purposes of First Amendment scrutiny between expenditures and contributions, rather than between associational and speech rights.
Moreover, there is no support in the Constitution, this legislation, or Supreme Court authority for the majority’s notion that political parties are entitled to favored treatment when assessing a contribution limit that impacts their associational rights". .The majority supports its position by stating that “a party speaks in large part through its identified candidates.”[3] Maj. op. at 1227. The same can be said, however, of any entity seeking to associate itself with a political candidate. That fact therefore does not serve to set political parties apart from others subject to contribution limits. More importántly, the Supreme Court has expressly rejected the argument that a party and its candidate are identical: “We cannot assume ... that this is so. Congress chose to treat candidates and their parties quite differently under the Act, for example, by regulating contributions from one to the other.” Colorado Republican Comm., 518 U.S. at 623-24, 116 S.Ct. 2309 (citation omitted). The Supreme Court and Congress have thus foreclosed the very assumption made by the majority here.
In holding the contribution limit at issue unconstitutional, the majority requires the FEC to provide evidence in support of Congress’ determination that political parties corrupt or appear to corrupt the political process through unlimited contributions.[4] The Supreme Court addressed the quantum of evidence required to support this interest in Shrink Missouri, and its discussion there cannot be squared with the majority’s treatment of the matter *1240 here. The Court pointed out that the necessary evidentiary showing “will vary up or down with the novelty and plausibility of the justification raised,” and that “the dangers of large, corrupt contributions and the suspicion that large contributions are corrupt are neither novel nor implausible.” Shrink Missouri, 120 S.Ct. at 906. Because the legitimacy of the interest is thus so critical to the evidence required, the relevant inquiry is whether the Court’s discussion in Shrink Missouri of the well-recognized dangers of large contributions applies when those contributions are from political parties rather than from other donors.
In Shrink Missouri, the lower court accepted the argument that the State had not justified the invocation of this interest with empirical evidence of actually corrupt practices or the public perception of a corrupting influence. The Supreme Court disagreed and expanded on the dangers flowing from large contributions generally.
In speaking of “improper influence” and “opportunities for abuse” in addition to “quid pro quo arrangements,” we recognized a concern not confined to bribery of public officials, but extending to the broader threat from politicians too compliant with the wishes of large contributors. These were the obvious points behind our recognition that the Congress could constitutionally address the power of money “to influence governmental action” in ways less “blatant and specific” than bribery.
Shrink Missouri, 120 S.Ct. at 905 (quoting Buckley, 424 U.S. at 28, 96 S.Ct. 612). The Court pointed out:
Even without the authority of Buckley, there would be no serious question about the legitimacy of the interests claimed, which, after all, underlie bribery and anti-gratuity statutes. While neither law nor morals equate all political contributions, without more, with bribes, we spoke in Buckley of the perception of corruption “inherent in a regime of large individual financial contributions” to candidates for public office, as a source of concern “almost equal” to quid pro quo improbity. The public interest in countering that perception was, indeed, the entire answer to the over-breadth claim raised in the Buckley case. This made perfect sense. Leave the perception of impropriety unanswered, and the cynical assumption that large donors call the tune could jeopardize the willingness of voters to take part in democratic governance. Democracy works “only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption.”
Id. at 905-06 (citations omitted).
The FEC contends that these concerns apply equally to large contributions from political parties, arguing that parties can use their ability to funnel large amounts into the campaigns of particular candidates in response to large donations by outside interests, to assist in the evasion of contribution limits placed on individual and political committee contributions, and to promote the personal interests of party leaders, their friends, and party factions. The FEC’s position voices long-standing Congressional concerns that have animated the history of efforts to reform federal election financing, many of which were addressed to the evils arising from large contributions to political parties that put the parties in political debt to the donors, debts which were often paid by the parties’ candidates. In United States v. International Union UAW-CIO, 352 U.S. 567, 77 S.Ct. 529,1 L.Ed.2d 563 (1957), for example, the Supreme Court addressed the circumstances giving rise to the Corrupt Practices Act, 18 U.S.C. § 610, which prohibited corporations arid labor unions from making contributions or expenditures in connection with federal elections. The Court found the following legislative history indicative of Congressional intent to “protect the political process from what it deemed to be the corroding effect of mon *1241 ey employed in elections by' aggregated power,” id. at 582, 77 S.Ct. 529:
We all know ... that one' of the great political evils of the time is the apparent hold on political parties which business interests and certain organizations seek and sometimes obtain by reason of liberal campaign contributions. Many believe that when an individual or association of individuals makes large contributions for the purpose of aiding candidates of political parties in winning the elections, they expect, and sometimes demand, and occasionally, at least, receive, consideration by. the beneficiaries of their contributions which not infrequently is harmful to the general public interest. It is unquestionably an evil which ought to be dealt with, and dealt with intelligently and effectively.
Id. at 576-77, 77 S.Ct. 529 (quoting remarks by “Senator Robinson, one of the leaders of the Senate”). “We all know that money is the chief source of corruption. We all know that large contributions to political campaigns ... put the political party under obligation to the large contributors, who demand pay in the way of legislation....” Id. at 577-78, 77 S.Ct. 529 (quoting Senator Bankhead offering 1940 amendments to the Hatch Act restricting contributions to federal elections).
One of the matters upon which I sensed that the public was taking a stand opposite to that of labor leaders was the question of the handling of funds of labor organizations. The public was aroused by many rumors of ... political contributions to parties and candidates which later were held as clubs over the head of high Federal officials.
Id. at 579, 77 S.Ct. 529 (quoting Congressman Landis, author of 1948 measure extending sections of Corrupt Practices Act to labor unions). These remarks,' all of which were made by federal legislators during the efforts to pass earlier campaign finance reform, establish that the dangers from large contributions by political parties are no more novel or implausible than those from large contributions generally.
The Court’s analysis of the quantum of evidence presented in Shrink Missouri governs the inquiry here. In concluding that the .evidentiary showing in that case was sufficient to justify the contribution limits challenged there, the Court cited an affidavit from a state legislator stating generally that large contributions have the potential to buy votes, and “newspaper accounts of large contributions supporting inferences of impropriety.” Shrink Missouri, 120 S.Ct. at 907. Although the majority largely ignores the record before us, it likewise contains affidavits and depositions from those who have been active in federal fund raising activities, both as candidates and as party activists. These materials state that large donors.to political parties give with an eye toward obtaining favorable consideration of legislation they deem important or obtaining access to a legislator in order to urge favorable action. See, e.g., Decl. of Robert Hickmott (DNC fundraiser), jt. app. at 452-53; Aff. of Robert Razen (staff person for Senator George Mitchell), id. at 462; Aff. of Former Senator Paul Simon, id. at 466; Decl. of Former Senator Tiniothy Wirth, id. at 545-46; Dep. of Paul Simon, id. at 636; Dep. of Timothy Wirth, id. at 649, 661 See also Fax from National Republicán Senatorial Comm., id. at 626. The record also reveals that although earmarking funds for a particular candidate is illegal, this prohibition is circumvented through “understandings” regarding what donors give what amounts to the party, which 'candidates are to receive what funds from the party, and what interests particular donors are seeking to promote. See, &.g., Decl. of Leon G. Billings (former Éxec. Dir. of Dem. Sen. Campaign Comm.), id. at 382; Decl. of Robert Hickmott (DNC fundraiser), id. at 446-48; Aff. of Paul Simon, id. at 465; Decl. of Timothy Wirth, id. at 543; Dep. of Timothy Wirth, id. at 644-45.
Senators are expected to encourage their major donors, who have maximized their contribution to the candidate, to make contributions to the state or national party, which in turn gives the candidates *1242 money for their campaigns. See, e.g., Decl. of Leon G. Billings, id. at 382-83; Decl. of Robert Hickmott, id. at 446-47; Aff. of R. William Johnstone (staff person for Senator Wysche Fowler, Jr.), id. at 457; Decl. of Timothy Wirth, id. at 543; Dep. of Paul Simon, id. at 635. See also Letter from Congressman Wayne Allred, id. at 191. Former Senator Simon candidly admitted, “I have found the process to be corruptive for everyone and, even those of us who go out of our way to make sure money does not influence our decision, we are affected by it.” Id. at 630; see also id. at 640 (noting one colleague saying bluntly, “We have to pay attention to who is buttering our bread.”).
In addition, the record contains numerous media articles and interviews reporting on episodes in which the inference can be drawn that donations to a party brought about access to that party’s candidates and legislators, which in turn furthered the donor’s business interests.[5] See generally id. at 250-89. Given the Supreme Court’s reliance on this very type of evidence in Shrink Missouri, I believe that we are required to credit it here and to hold that the FEC has indeed carried its evidentiary burden to support the legislative judgment that party contribution limits are necessary to prevent corruption and the appearance of corruption.
The majority opinion’s several responses to the evidence offered by the FEC all run afoul of Supreme Court authority. First, the majority begins on the wrong foot in relying on a statement by the plurality opinion in Colorado Republican Fed. Campaign Comm, that it was “ ‘not aware of any special dangers of corruption associated with political parties.’ ” Maj. op. at 1228 (quoting Colorado Republican Fed. Campaign Comm., 518 U.S. at 616, 116 S.Ct. 2309). This remark was not directed to contribution limits on party donations. Rather, it referred to limits on a party’s independent expenditures which, unlike contributions, are not deemed to be coordinated and therefore pass constitutional muster due to the absence of prearrangement and coordination. Id. This statement is simply inapposite to coordinated party contributions. Cf. Shrink Missouri, 120 S.Ct. at 907 (making same point about Colorado Republican Fed. Campaign Comm, with respect to government’s evi-dentiary burden).
Next the majority takes issue with Congress’ decision to limit party contributions *1243 as' a means of addressing the ability of corporations and other big donors to influence the legislative process. Here, too, the majority acts contrary to the admonition in Shrink Missouri that courts are not to “second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared.” 120 S.Ct. at 906 n. 5. “Where a legislature has significantly greater institutional expertise, as, for example, in the field of election regulation, the Court in practice defers to empirical legislative judgments ...” Id. at 912 (Breyer, J., concurring). Given the legitimacy of the goal of preventing corruption and the undeniable fact that parties funnel funds from donors to candidates when they coordinate expenditures, the Supreme Court has made clear that we are not at liberty to replace Congress’ judgment on an effective means for furthering its interest. See Buckley, 424 U.S. at 30, 96 S.Ct. 612 (court “has no scalpel” to probe Congressional choice of means to accomplish necessary end).
The majority also rejects the FEC’s argument that limits on party contributions are necessary to prevent unscrupulous party officials from furthering their pet interests, thereby corrupting or appearing to corrupt the legislative process. The majority posits that in adopting this theory, Congress “gravely misunderstands the role of political parties in our democracy.” Maj. op. at 1231. As a matter of common sense, it is difficult to credit the bald assertion that politicians do not understand the role political parties play in American politics,[6] Moreover, the majority is not at liberty to substitute its judgment for that of Congress on how best to balance the need to promote the role of political parties and to combat its potential for corruption. The majority also views the electoral and litigation processes as the proper means for righting the wrongs perpetrated by corrupt' party leaders, again displacing the judgment of Congress on matters uniquely within its province.
Finally, the majority rejects the argument that limits on party expenditures are necessary to prevent evasion of the Act’s other contribution limits. The majority believes that enforcement of the disclosure requirements in section 441a(a)(8) is adequate to protect against this problem. To the contrary, the Supreme Court has made it unmistakably clear that the existence of disclosure requirements is not a ground for invalidating contribution limits.
We specifically rejected this notion in Buckley, where we said ... that “Congress was surely entitled to conclude that disclosure was only a partial measure,' and that contribution ceilings were a necessary legislative concomitant to deal with the reality or appearance of corruption inherent in a system permitting unlimited financial contributions, even when the identities of the contributors and the amounts of their contributions are fully disclosed.” We understood contribution limits, on the other hand, to “focu[s] precisely on the problem of large campaign contributions-the narrow aspect of political association where the actuality and potential for corruption have been identified-while leaving persons free to engage in inde *1244 pendent political expression, to associate actively through volunteering their services, and to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources.” There is no reason to view contribution limits any differently today.
Shrink Missouri, 120 S.Ct. at 908 n. 7.
In sum, the majority has substituted a paean to its view of the role of political parties for a properly deferential assessment of the constitutionality of limits on coordinated party contributions under applicable Supreme Court authority. The result the majority reaches simply cannot be reconciled with that authority.
In my view, section 441a(d) is unquestionably valid under the analysis in Shrink Missouri and prior Supreme Court authority. The FEC has amply supported its argument that limits on coordinated expenditures by political parties serve the public interest in preventing both corruption and the appearance of corruption by limiting the leverage parties possess to pay off the political debts owed to large contributors. The FEC has offered evidence that the access purchased by large donations translates into power which distorts the democratic process. Both common sense and experience dictate that the public justifiably views the access obtained by large donations as the unfair opportunity to gain a candidate’s support on the basis of financial considerations rather than on policy or belief. The FEC has also supported its contention that the limits at issue are an integral part of FECA’s regulatory scheme because they prevent donors from evading the limits on contributions to a candidate by contributing to political parties with the understanding, tacit or otherwise, that the funds will be used for that candidate. Finally, the majority’s conclusion that the limit here is not narrowly drawn rings hollow in light of the Court’s earlier holding in this case that parties may make independent expenditures on behalf of a candidate.
I see no merit to the assertion that the political atmosphere has changed to the extent that the limits at issue are no longer needed. This evaluation, like so many of the others made by the majority in this case, is to be made by Congress through the legislative process and not by us through judicial fiat. Neither the majority nor the Committee has made a persuasive argument that human nature has changed in the twenty years that have passed since FECA was enacted. To the extent that the political process has in fact improved, FECA has played a major role in the curtailment of abuses. Eliminating an integral part of the Act would allow those abuses to flourish once again. The fact that FECA has accomplished what it was meant to do is hardly a justification for doing away with it. In holding to the contrary, the majority makes a grave error by turning a deaf ear to the voices of history that advise us to learn from our mistakes lest we repeat them.
Accordingly, I dissent.

. That section provides:
(3) The national committee of a political party, or a State committee of a political party, including any subordinate committee of a State committee, may not make any expenditure in connection with the general election campaign of a candidate for Federal office in a State who is affiliated with such party which exceeds—
(A) in the case of a candidate for election to the office of Senator or of Representative from a State which is entitled to only one Representative, the greater of—
(i) 2 cents multiplied by the voting age population of the State (as certified under subsection (e) of this section); or
(ii) $20,000; and
(B) in the case of a candidate for election to the office of Representative, Delegate, or Resident Commissioner in any other State, $10,000.
2 U.S.C. § 441a(d)(3).

. Significantly, the majority offers no evidence to the contrary beyond passages from law review articles which contain platitudes about the abstract value of parties in the American political process.

. In focusing on the speech a party can allegedly only make through its candidate, the majority blurs the very line it wishes to draw between limits on speech and limits on associational rights.

. In addition, the majority requires that Congress’ determination be analyzed in light of the vital role political parties play in that process. As I have discussed in text, Congress was clearly aware of the role parties play in the political process, and it enacted measures aimed at promoting that role as well as strengthening parties in general. The majority thus “double counts” the importance of protecting political parties and improperly substitutes its balancing of the competing values at issue here for that of Congress,

. Despite the Court’s explicit reliance on newspaper articles in Shrink Missouri, the majority here refuses to accord them any weight in addressing the Congressional goal of preventing public perception of corruption. The majority states that "media accounts documenting a vague (though visceral) public cynicism about campaign finance prove too little. We should not allow generic public dissatisfaction to support the restriction of political speech.” Maj. op. at 1230 n. 6. In so doing, the majority mischaracterizes and then ignores the significance of the media material here, and fails to accord any weight to the public interest in countering the perception of impropriety, which the Supreme Court has described "as a source of concern 'almost equal’ to quid pro quo improbity.” Shrink Missouri, 120 S.Ct. at 905-06 (quoting Buckley, 424 U.S. at 30, 96 S.Ct. 612).
Significantly, the Supreme Court authority upon which the majority relies was directed to evaluating limits on independent expenditures, which the Court has emphatically distinguished from coordinated expenditures.
[T]he constitutionally significant fact ... is the lack of coordination between the candidate and the source of the expenditure. This fact prevents us from assuming, absent convincing evidence to the contrary, that a limitation on political parties’ independent expenditures is necessary to combat a substantial danger of corruption of the electoral system.
Colorado Republican Campaign Comm., 518 U.S. at 617-18, 116 S.Ct. 2309 (citing Buckley, 424 U.S. at 45-46, 96 S.Ct. 612; Federal Election Comm’n v. National Conservative Political Action Comm., 470 U.S. 480, 498, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985)). When, as here, this constitutionally significant fact is missing and the expenditure is instead coordinated, the Court has clearly indicated that a substantial danger of corruption may be assumed absent convincing evidence to the contrary. The majority thus errs in placing the burden on the FEC rather than on the Colorado Republican Party, which certainly has not shouldered that burden in this case.

. The majority apparently concedes the problem in accusing Congress of failing to understand the political process, and attempts to shift the focus of its criticism from Congress to the FEC, asserting that the FEC misunderstands Congressional intent in defending limits on coordinated party spending as a means of combating corruption. See Maj. Op. at 1231 n. 7. The Supreme Court language in Colorado Republican Campaign Comm., upon which the majority relies, however, is found in its discussion of limits on independent party expenditures. See 518 U.S. at 616-18, 116 S.Ct. 2309. As I have previously pointed out, see supra at 1227 n. 5, the Court in that discussion specifically distinguished independent party spending from coordinated spending on the basis of the "constitutionally significant” "lack of coordination.” 518 U.S. at 617, 116 S.Ct. 2309. The majority relies on selective quotations and simply ignores the fact that the Supreme Court analyses in which these quotes occur is grounded on the very distinction that renders the majority’s reliance invalid.